**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GE RENEWABLES US LLC,<br>Petitioner,<br>v.<br>HORNBECK OFFSHORE OPERATORS LLC,<br>Respondent. | Civil Action No. 1:26-cv-4014 |

## **PETITION FOR STAY OF ARBITRATION, INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT**

Petitioner, GE RENEWABLES US LLC ("GERE" or "Petitioner"), by and through its attorneys, brings this action to permanently stay the arbitration proceedings commenced by Respondent, Hornbeck Offshore Operators LLC ("Hornbeck"), against GERE before the International Court of Arbitration (the "ICA") of the International Chamber of Commerce (the "ICC") under ICA Case No. 30344/ICA9. Petitioner further seeks injunctive relief enjoining Hornbeck from continuing the arbitration proceedings in the ICA over GERE's objections and enjoining any further proceedings in the ICA. In addition, Petitioner seeks a declaratory judgment that it has no obligation to arbitrate any dispute with Hornbeck arising from the unconsummated negotiations of a charter of Hornbeck's offshore support vessel, the M/V BRIARWOOD. Petitioner respectfully alleges as follows:

### **SUMMARY**

1. Petitioner brings this action pursuant to Section 4 of Title 9 of the United States Code, the Federal Arbitration Act (the "FAA"), to permanently stay the arbitration commenced by Hornbeck before the ICA in the proceeding identified as ICA Case No. 30344/ICA9. *See, e.g.*, *In*

*re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 139-41 (2d Cir. 2011) (concluding that § 4 of the FAA permits stay of a private arbitration); *accord China Shipping Container Lines Co. v. Big Port Serv. DMCC*, 803 F. App'x 481, 485 (2d Cir. 2020) (holding the court has authority to enjoin maritime arbitration proceedings).

2. Petitioner also seeks injunctive relief pursuant to Federal Rule of Civil Procedure ("FRCP") 65, enjoining Hornbeck from continuing the arbitration proceedings it commenced against GERE and enjoining any further proceedings in the ICA.

3. Petitioner further seeks a declaratory judgment pursuant to FRCP 57 and 28 U.S.C. § 2201(a) that GERE has no obligation to arbitrate any dispute with Hornbeck.

4. As detailed in the Memorandum of Law accompanying this Petition, the basis for a stay, preliminary injunction, and a declaratory judgment is that GERE and Hornbeck (each, a "Party," and collectively, the "Parties") did not enter into a valid, binding written arbitration agreement as required by the FAA, or into any charter agreement containing an arbitration provision.

5. GERE has informed Hornbeck on multiple occasions that it disputes having entered into any contract with an agreement to arbitrate. However, Hornbeck has insisted on moving forward to commence the ICA arbitration.

6. GERE has further informed the ICA that it is not a party to any written agreement to arbitrate Hornbeck's claims, and that GERE does not agree to the ICA determining the "arbitrability" of the dispute. However, the ICA has advised that it intends to proceed regardless of GERE's objections and whether GERE participates in such arbitration. The ICA has set a deadline of May 26, 2026, for GERE to file a substantive Answer to Hornbeck's arbitration claim.

7. Should GERE be forced to arbitrate a dispute despite having never entered into any contract with Hornbeck containing an agreement to arbitrate, it will suffer irreparable harm. In addition, GERE will establish that it is likely to succeed on the merits of its claim that no contract was ever formed between the Parties, or at a minimum that sufficiently serious questions going to the merits exist to make them a fair ground for litigation, and that the balance of hardships tips decidedly in GERE's favor. *See NASDAQ OMX Grp., Inc. v. UBS Sec. LLC*, 957 F. Supp. 2d 388, 402 (S.D.N.Y. 2013) (outlining the standard governing when a court may issue a preliminary injunction to enjoin arbitration). Also, any injunction granted by the Court will not be against the public interest. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010).

## THE PARTIES

8. GERE is a Delaware-registered limited liability company with its principal place of business at 8000 E. Maplewood Ave. Building 5, Suite 250, Greenwood Village, Colorado 80111.

9. Hornbeck is a Delaware-registered limited liability company with its principal place of business at 103 Northpark Boulevard, Covington, Louisiana 70433.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the FAA, 9 U.S.C. § 4. *See, e.g.*, *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) ("The District Court for the Southern District of New York had authority to enjoin arbitration … Federal courts generally have remedial power to stay arbitration.").

11. This Court also has jurisdiction of this matter pursuant to its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, because the underlying dispute concerns a dispute regarding the negotiation of a vessel time charter which would, if formed, constitute a maritime contract. *See, e.g.*, *Norfolk S. Ry. v. Kirby*, 543 U.S. 14, 22–23 (2004).

12. Petitioner hereby elects to proceed under the Court's maritime jurisdiction pursuant to FRCP 9(h).

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1390, which exempts cases under this Court's maritime jurisdiction from the venue provisions of Title 28, United States Code, chapter 87; and 9 U.S.C. § 4 and 28 U.S.C. § 1391(b), to the extent applicable, because Hornbeck has commenced and is prosecuting the arbitration in this district, and the arbitration Hornbeck seeks to prosecute is sited in New York, New York. *See* 28 U.S.C. § 1391(b)(2). Nothing in this paragraph constitutes an admission by GERE of the existence or validity of the agreement Hornbeck invokes.

## FACTS

### I. The Parties Negotiated Toward, but Never Concluded, a Time Charter Party

14. Beginning in or about June 2025, GERE requested Clarkson PLC (trading as "Clarksons"), a vessel chartering broker, to conduct a survey to identify possible vessels available for charter to support offshore work by GERE.

15. Clarksons ultimately identified Hornbeck as having vessels that might be suitable for GERE's use.

16. After initial discussions regarding other vessels, by October 2025, GERE and Hornbeck were negotiating a potentially acceptable charter offer of Hornbeck's offshore support vessel, the M/V BRIARWOOD (the "Vessel").

17. The negotiations were conducted primarily by GERE personnel and Hornbeck personnel directly. At the outset of negotiations and repeatedly throughout, GERE personnel informed Hornbeck that the conclusion of a binding charter would require management approval.

18. During the period from October 24, 2025, through November 17, 2025, GERE and Hornbeck attempted to negotiate the terms to be offered by Hornbeck to enable GERE to evaluate Hornbeck's proposal. Negotiations were carried out, in part, through exchanges of successive negotiating mark-ups of a form agreement published by "BIMCO" (a producer of standard form maritime agreements) known as the "SUPPLYTIME 2017" Time Charter Party for Offshore Support Vessels form (each iteration, a "Negotiating Draft"). True and correct copies of the negotiation correspondence between Hornbeck and GERE described in paragraphs 19–34 below are Exhibits A through G to the accompanying Declaration of H. Allen Black ("Decl."). The Negotiating Draft (Version 8) reflecting the Parties' November 17, 2025 exchanges is Decl. Exhibit H, and the Hornbeck Proposals on Commercial Terms of November 16, 2025, are Decl. Exhibit I.

19. On October 31, 2025, Pierre Furic of GERE emailed Kevin Douglass of Hornbeck to note that there were "still some red points TBC [to be clarified]," including extension issues, pricing, improvements before delivery, and delivery date.

20. On November 5, 2025, Furic emailed Douglass expressing concern with the status of discussions, stating, "We need to progress and understand if this is working."

21. The same day, Douglass responded with substantial edits to GERE's Statement of Work detailing the specifics of the work intended to be accomplished by the Vessel, if chartered. The issues noted included the operational capabilities of the Vessel to perform the work required,[1]

---

[1] The operational issues under discussion included vessel speed, workability with crew transfer vessels, maintenance of the gangway to permit personnel to move from the Vessel to the work site, electrical systems, provision of gear lockers, and provision of an office for charterer personnel. *See* Decl. Ex. E.

which Party would be responsible for which costs, costs of necessary conversions, health and safety standards, and services to be provided by Hornbeck as the Vessel owner.

22. On November 10, 2025, Douglass sent a version 5 of the Negotiating Draft, together with preliminary comments on the financial terms of the proposed charter as Annex D ("Annex D").

23. On that same date, Jason Dennis of Hornbeck had a text message chat with Tyler Spofford of GERE regarding the estimates for preparing the Vessel for use by GERE. In response, Spofford informed Dennis that, "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one which means if we take the boat, we may have to start without the grillage."

24. On November 13, 2025, Furic emailed Douglass with GERE's comments on the Negotiating Draft, noting a lack of agreement with regard to various commercial and financial terms, including:

- the date of delivery;
- early-termination provisions and financials applicable in the event of a stop-work order from the U.S. government;[2]
- mobilization terms and financials;
- cancellation terms;
- demobilization financials;

[2] Early-termination provisions are a particularly critical issue in light of the current administration's efforts to terminate offshore wind development. Both Parties were well aware that on January 29, 2025, the new federal administration had issued a Presidential Memorandum directing federal agencies to, *inter alia*, review wind leasing and permitting practices for offshore wind projects. 90 Fed. Reg. 8,363 (Jan. 29, 2025). The government subsequently issued stop-work orders in connection with multiple offshore wind projects, including the Empire Wind, Revolution Wind, Sunrise Wind, and Coastal Virginia Offshore Wind projects. *See, e.g.*, *Empire Leaseholder LLC v. Burgum*, D.D.C. Case No. 26-cv-00004; *Revolution Wind, LLC v. Burgum*, D.D.C. Case No. 25-cv-2999; *Sunrise Wind LLC v. Burgum*, D.D.C. Case No. 26-cv-00028; and *Virginia Electric & Power Co. v. U.S.*, E.D.Va. Case No. 25-cv-00830.

- condition of the Vessel terms;
- "owner to provide" and "charterers to provide" terms;
- Hornbeck-requested provisions to increase the daily rate to be paid for the Vessel (the daily rate paid for the use of a vessel is commonly referred to as the "charter hire" or "hire"; provisions to increase hire are commonly referred to as "escalation of hire" terms);
- suspension and termination terms;
- the off-hire terms and financial aspects (e.g. when the Vessel would not be operating in service to GERE as charterer or would be unable to perform due to equipment failures);
- liabilities and indemnities;
- insurance terms;
- force majeure terms and financials (e.g., when the Vessel would not be able to perform for causes beyond the reasonable control of the owner);
- financial security terms; and
- various financial and commercial terms set out in the draft Annex D to the proposed charter, such as daily hire, supplemental charges, the charges for mobilization and demobilization, off-hire charges, and charter hire during events of force majeure, as well as multiple other issues subject to legal review.

*See* Decl. Ex. H (Negotiating Draft, Version 8).

25. On November 16, 2025, Douglass emailed Furic, attaching Hornbeck's proposals on an updated Negotiating Draft, with comments and counterproposals on the commercial terms, and stating, "Upon resolution, the BIMCO and ANNEX D will require updates and I can send

additional comments at that time to formalize the agreements .... Jason would like to also continue the discussion related to modifications – ANNEX D [the commercial and financial terms] will need to be updated accordingly." The markup to the Negotiating Draft included specific disputes over the delivery date, the off-hire terms and financials, the "owner to provide" and "charterer to provide" terms, the adjustment of hire terms, and the off-hire terms and financials. The Hornbeck markup of Annex D included counterproposals on the charter hire rate, increases in the charter hire rate for the carriage of additional personnel, charter hire escalation, the allocation of costs for lubricants, and the terms and financials associated with force majeure events. Decl. Ex. I (Hornbeck Proposals on Commercial Terms of November 16, 2025).

26. On November 17, 2025, Furic emailed Douglass, noting disagreements over Annex D, the delivery date, redelivery provisions, the period of hire, early termination, the interest rate, tax issues, delivery and redelivery terms, mobilization financials, cancellation terms, pre-delivery requirements and preconditions, "owner to provide" and "charterer to provide" terms, hire escalation provisions requested by Hornbeck, off-hire terms and financials, liabilities and indemnities, force majeure terms and financials, and multiple additional issues for legal review. Decl. Ex. H.

27. The November 17, 2025 response from GERE also included a number of notes conveying that GERE did not intend to enter into a binding charter agreement until various key issues were first resolved, including a notation that discussions on Hornbeck's proposal to escalate charter hire based on changes to its costs were "parked," meaning that further negotiations on charter hire would be tabled until the resolution of other issues; and a note in connection with pre-delivery preparation that "[GERE] will need confirmation of mobilization work/upgrade to be performed as per expectations before entering the charter party though." The GERE response

further objected to Hornbeck's prior markup because it had incorrectly stated that certain matters were "accepted," while GERE did not agree to such provisions.

28. Also on November 17, 2025, Douglass emailed to Furic updated cost estimates for mobilization and modification of the Vessel, and a draft "Early Works" letter agreement to procure long–lead time materials for the proposed modifications. Notably, Hornbeck's draft letter agreement stated that:

> Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD … The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that **the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners**.

Decl. Ex. G (emphasis added). Hornbeck's draft further stated that the Early Works agreement would terminate "**[u]pon execution of the Time Charter**." *Id*. (emphasis added).

29. On November 19, 2025, Douglass texted Furic to check on the status of GERE's updated positions to be provided in another Negotiating Draft. Furic replied, stating in material part, "We understand deadlines. Priority is management decision before the end of the week now. I suggest we finalise contract once we have management confirmation to proceed with your offer. I still have in mind to propose a call on Friday but expect feedback from Tyler [Spofford] tomorrow before."

30. On or about November 20, 2025, Jason Dennis of Hornbeck contacted Tyler Spofford of GERE to ask what else Hornbeck could do to reach an agreement on the proposed charter.

31. On November 21, 2025, in response to inquiries from Douglass regarding the state of negotiations and GERE's counterproposals or agreements, Furic emailed Douglass that "we have not been able to take clear decision today. I keep you posted asap early next week."

32. On November 26, 2025, in a conference call between GERE and Hornbeck, GERE advised that it was considering another offer. As the conference was closing, Adam Shrives of Hornbeck stated to GERE's representatives, in substance, that "unless you want to let us make another offer, it seems like your minds are made up."

33. The Parties at no time executed any version of the Negotiating Draft, or any "fixture recap," signed term sheet, or other executed writing evidencing any agreement to form a charter, or to agree to arbitration.

34. GERE took no actions consistent with the existence of a binding charter party. GERE did not nominate the Vessel for any voyage or service, did not pay any mobilization fee, hire, or other consideration to Hornbeck, and did not direct or accept the performance of any services by Hornbeck.

## II. Hornbeck's Efforts to Pursue Arbitration

35. On December 8, 2025, Hornbeck wrote to GERE, claiming for the first time that a time charter had been concluded subject to minor terms. Decl. Ex. J.

36. On December 16, 2025, Hornbeck wrote again to GERE to demand a meeting pursuant to the dispute resolution clause in the unsigned, unagreed Negotiating Draft. Decl. Ex. K.

37. On December 31, 2025, counsel for GERE wrote to Hornbeck, explaining that no charter contract had been reached and declining Hornbeck's demand for a meeting, but offering to discuss the matter between counsel. Decl. Ex. L.

38. On March 2, 2026, counsel for Hornbeck emailed counsel for GERE to advise that Hornbeck was pressing ahead with the draft dispute resolution clause from the unsigned, unagreed Negotiating Draft, and stating that "the next step under the BIMCO charter is to mediate this

dispute under the International Chamber of Commerce's Mediation Rules." Hornbeck's counsel encouraged GERE to participate in the proposed mediation. *See* Decl. Ex. M.

39. On March 6, 2026, counsel for Hornbeck emailed counsel for GERE to advise of Hornbeck's submission of a request for mediation. *See* Decl. Ex. N.

40. On March 9, 2026, counsel for GERE emailed counsel for Hornbeck to reiterate GERE's position that the Parties' negotiations never reached an agreement to be bound or sufficient to create a fixture, and therefore the unilateral request for ICC mediation, premised on the existence of such an agreement, was at best inaccurate and premature. GERE's counsel requested that Hornbeck's counsel identify the specific communication on which Hornbeck relied to establish that GERE had accepted a fixture of the Vessel and agreed to be bound to the alleged charter, noting that such information would provide clarity as to the basis for Hornbeck's position, and that GERE's counsel would be pleased to talk through the issues with Hornbeck's counsel in the hopes of avoiding unnecessary litigation. *See* Decl. Ex. O.

41. That evening, on March 9, 2026, counsel for Hornbeck emailed counsel for GERE to state that Hornbeck's position was based on a review of the Negotiating Draft and his conclusion that "perhaps as little as two" nonessential terms remained open. *See* Decl. Ex. P. He expressed a general willingness to discuss but declined to postpone the ICC mediation process that Hornbeck had initiated.

42. On March 13, 2026, counsel for GERE emailed counsel for Hornbeck to remind him that whether parties have agreed to submit a particular dispute to arbitration is an issue for judicial determination, so therefore if Hornbeck wished to compel mediation and/or arbitration, the proper forum would be a federal district court. Counsel also advised that GERE would respond to the ICC to dispute that GERE had agreed to arbitration. *See* Decl. Ex. Q.

43. That same day, counsel for GERE notified the ICC that GERE did not agree that it had agreed to participate in ICC mediation with Hornbeck. *See* Decl. Ex. R.

44. On March 17, 2026, the ICC wrote the Parties to advise that because the Parties did not agree to mediation, the request for mediation was closed.

45. Late on the evening of April 10, 2026, counsel for Hornbeck left a voicemail for counsel for GERE to ask if GERE would consent to proceed in the Eastern District of Louisiana instead of the ICC, and to note his understanding that GERE did not agree that there was a contract between it and Hornbeck.

46. On April 20, 2026, counsel for Hornbeck emailed counsel for GERE to advise that Hornbeck had initiated an arbitration with the ICC.

47. On April 24, 2026, GERE received a letter from the ICA advising that Hornbeck had initiated an arbitration against GERE, requiring an answer within 30 days along with its evidentiary exhibits. *See* Decl. Ex. T. Attached to the correspondence was Hornbeck's Request for Arbitration (the "Arbitration Demand"). *See* Decl. Ex. U.

48. Hornbeck's Arbitration Demand concedes that "the parties did not sign a written agreement" (Arbitration Demand ¶ 10) and rests its demand for arbitration on Hornbeck's allegation that the Parties had "reached an enforceable verbal contract (which was confirmed in material part in writings exchanged between the parties)." *See* Decl. Ex. U ¶ 10. The Arbitration Demand further alleges that, "[b]y November 14, 2025, the parties had concluded the essential terms of the charter party," identifying four asserted terms: "the vessel, charter commencement date, charter duration, and day rate." *Id.*

49. Hornbeck later concedes in the Arbitration Demand that, after that date, the Parties continued to negotiate the day rate and "circulated an updated pricing sheet reflecting the new, discounted rate." *See* Decl. Ex. U ¶ 38.

50. The Arbitration Demand accordingly seeks arbitration under the ICC Rules of Arbitration, with New York, New York as the seat of arbitration, on the basis of the alleged dispute resolution provisions in the unexecuted Negotiating Draft and an alleged oral agreement. *See* Decl. Ex. U.

### III. Hornbeck and the ICA Refused to Voluntarily Stay the Arbitration

51. On April 30, 2026, counsel for GERE wrote to counsel for Hornbeck to note the receipt of the Request for Arbitration filed with the ICA and the lack of evidence of an agreement between the Parties, and to again encourage Hornbeck to "simply identify the evidentiary basis on which it relies for its claim and sit down with GERE to resolve this dispute reasonably." *See* Decl. Ex. V. Counsel further noted that:

> With regard to the proper forum for this dispute, as discussed in our earlier letter, the question of whether an arbitration agreement was made is one that can only be resolved by a court pursuant to Section 4 of the Federal Arbitration Act and well-established precedents from the Supreme Court to district courts.

*Id.*

52. That same day, GERE wrote to the ICA case management team to request the ICA to stay the arbitration proceeding. *See* Decl. Ex. W. GERE explained that it disputed having entered into an arbitration agreement with Hornbeck. GERE further noted that while the ICC Arbitration Rules provide that the question of whether an enforceable arbitration agreement exists may be determined by the arbitration panel or be referred to the ICA for decision pursuant to its

Rule 6(3) or 6(4), respectively, that is not the law under the FAA, United States Supreme Court precedent, or the precedent of the Southern District of New York.

53. On May 1, 2026, counsel for Hornbeck responded by email that Hornbeck would be willing to mediate, but only in parallel with the arbitration, and it would not agree to a stay of the proceeding. *See* Decl. Ex. X.

54. On May 7, 2026, the ICA responded by email to GERE's request for a stay of the proposed arbitration by stating as follows:

> If any party against which a claim has been made does not submit an Answer, the arbitration will proceed and the arbitral tribunal will decide any question of jurisdiction or of whether the claims may be determined together, unless the Secretary General refers the matter to the Court for its decision (Article 6(3)). Furthermore, if any party refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure (Article 6(8)).
>
> We understand that Respondent is raising a plea pursuant to Article 6(3). A decision will be taken on Respondent's pleas pursuant to Article 6(3) upon payment of the provisional advance. Please do not file any submissions or comments until we inform you of the decision pursuant to Article 6(3).
>
> **Answer to the Request for Arbitration**
>
> Without prejudice to Claimant's comments requested above, we refer to our correspondence dated 24 April 2026 and look forward to receiving Respondent's Answer by 26 May 2026 (Article 5(1)).

*See* Decl. Ex. Y.

55. The ICA has thus refused to stay the pending arbitration, and further stated its intent to decide by itself the question of whether the dispute between Hornbeck and GERE is arbitrable, notwithstanding having been advised of the unequivocal law that the question of who is to decide whether a matter is arbitrable is referred by the FAA to a federal district court of competent

jurisdiction, unless there is a **clear and unequivocal agreement** to refer such a decision to arbitration. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995).

56. The ICA further stated that it was requiring GERE to provide a full Answer to Hornbeck's Arbitration Demand, along with its exhibits, and to indicate its position regarding the number of arbitrators, before the ICA would even consider a request to stay the proceedings.

57. Accordingly, absent intervention by this Court, GERE faces an imminent deadline of May 26, 2026, to file a substantive Answer in an arbitration to which it never agreed.

58. As noted above, throughout the course of the Parties' communications, GERE has invited Hornbeck to produce any documentation Hornbeck believed evidenced the formation of a binding agreement. However, Hornbeck has not produced any executed charter party, fixture recap, or other documentation evidencing the formation of a binding agreement, and it has instead proceeded to commence and prosecute the Arbitration.

## GERE IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THERE IS NO AGREEMENT TO ARBITRATE

59. Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute that the party has not agreed to submit. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

60. Where a party disputes that any arbitration agreement was ever formed, the question of contract formation is for the court, not the arbitrator, to decide. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296–301 (2010); *Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024).

61. The United States Court of Appeals for the Second Circuit has noted that "a charter party is merely a contract, subject to all the rules and requirements of contract law," and "[w]hether

there was a meeting of the minds resulting in a charter party is a question of fact." *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 125 (2d Cir. 1982).

62. The Second Circuit later noted that "[a] 'recap' communication, or 'fixture,' is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 148 (2d Cir. 2001).

63. As noted above, GERE made plain to Hornbeck that it was not prepared to enter into a binding charter agreement until it had resolved various issues with Hornbeck and received management approval.

64. The court in *Great Circle* noted that in the shipping industry, dealings "are usually conducted with a sense of urgency under severe time constraints." *Great Circle*, 681 F.2d at 125. In such cases, charters are formed in two stages. The first includes the negotiation through brokers of "main" terms, referring to the ship, the time and place of delivery, duration of charter, redelivery, hire rate, the printed form on which the contract is to be based, and "any other term that a party deems important." *Id*. When agreed, the main terms are agreed through a "fixture." Then, after the fixture is agreed, the parties negotiate "details," the minor or side issues to flesh out the agreement. *Id*.

65. However, where a party communicates "an intent not to be bound until [it] achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *accord R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984).

66. In this matter, the negotiations were conducted over several months as GERE sought to clarify the offer of Hornbeck, and the negotiations were conducted largely by the Parties themselves, and not by brokers.

67. GERE had expressly informed Hornbeck that no agreement would be fixed until it had management approval.

68. Likewise, Hornbeck also confirmed that it did not intend to be bound and the Vessel would be "subject to availability" until all details of the proposed charter had been agreed to. Hornbeck also expressly confirmed its understanding that the charter would not be fixed until "execution of the Time Charter." Decl. Ex. G.

69. Further, as evidenced above, the Parties never reached agreement on the "main" terms such as the date of delivery, the duration of the proposed charter, the financial details including the charter hire and its proposed escalation, the mobilization, off-hire terms, or force majeure, and other key issues. Hornbeck never stated a final offer with agreed financial and commercial terms, and GERE never sent any "fixture" communication to Hornbeck. The Parties never signed or executed the Negotiating Draft and never agreed to a binding charter.

70. Because no contract was ever formed between GERE and Hornbeck, no arbitration clause was ever formed between them, and GERE has no obligation to arbitrate any dispute with Hornbeck.

71. GERE is likely to succeed on the merits of its claim that no contract was ever formed between the Parties. At a minimum, GERE has met the alternative standard showing that there are sufficiently serious questions going to the merits to make them a fair ground for litigation.

**GERE WILL BE IRREPARABLY HARMED BY ARBITRATION WITHOUT ITS CONSENT**

72. GERE will suffer imminent and irreparable harm if an injunction is not granted because it will be forced to arbitrate a dispute it has not agreed to arbitrate, and it will be deprived of its procedural and substantive rights to judicial adjudication. Courts emphasize that arbitration is a matter of consent, not coercion, and compelling arbitration without agreement undermines this

principle. *See, e.g.*, *UBS Sec. LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011); *NASDAQ OMX Grp., Inc. v. UBS Sec. LLC*, 957 F. Supp. 2d 388, 402 (S.D.N.Y. 2013).

73. Hornbeck has caused the ICA to set a deadline of May 26, 2026, for GERE to file an Answer in an arbitration grounded on a contract that was never formed. Hornbeck's Request for Arbitration claims approximately $25 million. Under Article 6(8) of the ICC Rules of Arbitration, the arbitration will proceed notwithstanding any refusal or failure of GERE to participate. GERE accordingly faces the choice of either defaulting, in which case the arbitration will proceed in GERE's absence, or incurring the substantial costs of defending a $25 million claim where no contract, and accordingly no agreement to arbitrate, was ever formed. *See Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Relations*, 107 F.3d 979, 985 (2d Cir. 1997) (affirming injunctive relief for company that "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable"). Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm.

**THE BALANCE OF HARDSHIPS WEIGHS IN GERE'S FAVOR**

74. The balance of equities tips decidedly in GERE's favor because, absent an injunction, GERE will be forced to expend substantial resources and submit to an arbitration proceeding to which it never agreed, thereby forfeiting its right to a judicial determination of arbitrability and the procedural protections of this Court. By contrast, Hornbeck will suffer no cognizable prejudice beyond a brief delay in pursuing its claims, which can proceed in the proper forum if an agreement is found to exist.

75. Further, courts in this circuit recognize the importance of preserving the status quo pending a determination of arbitrability. *See, e.g.*, *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990). Absent an injunction, the status quo would be

irreparably altered by forcing GERE into an arbitration proceeding despite the absence of any agreement.

## AN INJUNCTION WOULD NOT BE AGAINST THE PUBLIC INTEREST

76. An injunction granted by the Court pursuant to this Petition would serve the public interest by enforcing the FAA's mandate that arbitration must be grounded in actual contractual consent. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[A]rbitration is a matter of consent."). If the parties have not consented to arbitrate a claim, the district court is not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right. *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011). Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *Id.* at 127.

77. Therefore, the public interest favors enjoining the arbitration unless and until a court determines whether the Parties ever entered into a valid agreement to arbitrate.

78. No previous application has been made for the relief sought herein.

## REQUEST FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1. Issue an Order permanently staying the arbitration commenced by Respondent before the ICA identified as Case No. 30344/ICA9;

2. Enjoin Respondent from continuing the arbitration proceedings over Petitioner's objections, and enjoin any further proceedings in the ICA;

3. Enter a Declaratory Judgment in favor of Petitioner stating that no agreement to arbitrate exists between Petitioner and Respondent;

4. Award Petitioner the attorneys' fees, costs, expenses, and disbursements associated with the prosecution of this action; and

5. Grant any such other relief this Court deems just and proper in the circumstances.

Dated: May 14, 2026

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: *<u>/s/ Aldo A. Badini</u>*

Aldo A. Badini
200 Park Avenue
New York, NY 10166-4193
ABadini@winston.com

**MILLS BLACK LLP**

Thomas L. Mills
H. Allen Black
1215 19th Street, NW
Washington, DC 20036
TMills@millsblack.com
HAblack@millsblack.com

*Counsel to Petitioner*

CC: International Court of Arbitration (via email)
Daniel Charest, Counsel to Hornbeck (via email)

**VERIFICATION**

I, Tyler Spofford, the Vineyard Marine Operations Package Manager of GE Renewables US LLC, hereby declare and attest under penalty of perjury that I have read the foregoing Petition and believe, to the best of my knowledge, information, and belief, that the facts stated therein are true and correct.

Dated: May 14, 2026

Tyler Spofford

Tyler Spofford