**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GE RENEWABLES US LLC,<br>Petitioner,<br>v.<br>HORNBECK OFFSHORE OPERATORS LLC,<br>Respondent. | Civil Action No. 26-cv-04014 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**


**Page**

I. PRELIMINARY STATEMENT ..... 1

II. STATEMENT OF FACTS ..... 2

1. The Parties' negotiations regarding the M/V BRIARWOOD ..... 2
2. The Parties exchanged successive drafts of the BIMCO Form without resolving material terms ..... 3
3. Hornbeck sought to force dispute resolution under the draft charter form ..... 7
4. Hornbeck and the ICA refused to voluntarily stay the arbitration ..... 10

III. ARGUMENT ..... 12

1. The standard for a temporary restraining order and preliminary injunction ..... 12
2. The Court is to decide whether a binding arbitration agreement was formed ..... 12
3. GERE is likely to succeed on the merits because there was no meeting of the minds between Hornbeck and GERE ..... 14
   a. GERE repeatedly communicated that it did not intend to be bound until a complete agreement was reached ..... 15
   b. GERE Never Communicated Any Acceptance or Confirmation of a Fixture ..... 16
   c. The maritime fixture doctrine requires agreement on a charter's essential terms ..... 17
   d. No fixture was reached on the main terms of a charter ..... 18
   e. Hornbeck cannot identify any "fixture" communication ..... 20
   f. In light of the lack of agreement, no fixture was reached ..... 22
4. GERE will suffer irreparable harm absent immediate relief ..... 22
5. The balance of equities and the public interest favor injunctive relief ..... 23
6. A nominal bond is appropriate ..... 25

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Express Fin. Advisors Sec. Litig.*,
672 F.3d 113 (2d Cir. 2011)....................24

*Asterope Shipping Co. v. CSC Sugar LLC*,
757 F. Supp. 3d 349 (S.D.N.Y. 2024)....................2, 13

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)....................13

*Basank v. Decker*,
449 F. Supp. 3d 205 (S.D.N.Y. 2020)....................12

*Clarkson Co. v. Shaheen*,
544 F.2d 624 (2d Cir. 1976)....................25

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)....................2, 12, 13, 14

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996)....................25

*Empire Leaseholder LLC v. Burgum*,
D.D.C. Case No. 26-cv-00004....................19

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)....................11, 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010)....................2, 12, 24

*Great Circle Lines, Ltd. v. Matheson & Co.*,
681 F.2d 121 (2d Cir. 1982)....................2, 16, 17, 22

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)....................13

*Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*,
107 F.3d 979 (2d Cir. 1997)....................22

*Merrill Lynch Inv. Managers v. Optibase Ltd.*,
337 F.3d 125 (2d Cir. 2003)....................12, 22

*NASDAQ OMX Grp., Inc. v. UBS Sec. LLC*,
957 F. Supp. 2d 388 (S.D.N.Y. 2013)....12, 22

*Olin Holdings Ltd. v. State*,
73 F.4th 92 (2d. Cir. 2023) ....13, 14

*R.G. Group, Inc. v. Horn & Hardart Co.*,
751 F.2d 69 (2d Cir. 1984)....17

*Revolution Wind, LLC v. Burgum*,
D.D.C. Case No. 25-cv-2999 ....19

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
322 F.3d 115 (2d Cir. 2003)....13

*Sunrise Wind LLC v. Burgum*,
D.D.C. Case No. 26-cv-00028 ....19

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
241 F.3d 135 (2d Cir. 2001)....14, 15, 16

*UBS Sec. LLC v. Voegeli*,
405 F. App'x 550 (2d Cir. 2011) ....22

*Va. Elec. & Power Co. v. United States*,
E.D. Va. Case No. 25-cv-00830 ....19

*VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*,
No. 11 Civ. 0198, 2014 WL 4928929 (S.D.N.Y. Oct. 2, 2014), *aff'd*, 605 F. App'x 59 (2d Cir. 2015)....14

*Winston v. Mediafare Ent. Corp.*,
777 F.2d 78 (2d Cir. 1985)....17

**Statutes**

9 U.S.C. § 1 et seq....10, 11

9 U.S.C. § 4....10

**Other Authorities**

Presidential Mem., *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 29, 2025) ....19

Fed. R. Civ. P. 11 ....10

Fed. R. Civ. P. 65(c) ....................25

ICC Rules art. 5(1) ....................11

ICC Rules art. 6(3) ....................10, 13

ICC Rules art. 6(3) ....................11

ICC Rules art. 6(4) ....................10, 13

ICC Rules art. 6(8) ....................2, 11, 23

## I. PRELIMINARY STATEMENT

Petitioner GE Renewables US LLC ("GERE") respectfully moves to enjoin a $25 million arbitration that Hornbeck Offshore Operators LLC ("Hornbeck") commenced before the International Court of Arbitration ("ICA") of the International Chamber of Commerce ("ICC") on the basis of an alleged charter party[1] that was never formed (such arbitration, the "Arbitration").

GERE had been working for months to identify an acceptable charter offer for an offshore support vessel. In the course of those efforts, GERE and Hornbeck (each a "Party," and collectively, the "Parties") had exchanged eight successive mark-up drafts of a time charter form but had not reached agreement on acceptable commercial and financial terms, or several other critical issues, much less an agreement to charter Hornbeck's vessel. By the time GERE finally broke off efforts to reach an acceptable proposal from Hornbeck, neither party had signed any agreement or otherwise committed to be bound to a charter.

Further, GERE's representatives had expressly informed Hornbeck on multiple occasions that they would require management approval to enter into a binding agreement, and that certain conditions precedent would need to be satisfied before presenting the proposal to GERE's management.

Disappointed when the Parties failed to reach a charter agreement, Hornbeck first sought to continue negotiations but then decided to force GERE into an arbitration to which it had never agreed on the basis of an arbitration clause in the draft agreement that had been under negotiation.

Under federal maritime law, "a charter party is merely a contract, subject to all the rules and requirements of contract law," and "[w]hether there was a meeting of the minds resulting in a

[1] A "charter party" or "charter" is a contract for the use of a vessel. A "time charter" is a contract under which the charterer may direct the use of the vessel to perform services for a specified period of time, while the vessel owner remains responsible for the operation, crewing, and maintenance of the vessel.

charter party is a question of fact." *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 125 (2d Cir. 1982). When a party disputes that a contract compelling arbitration was ever formed, that threshold question is for the court, not the arbitrator, to decide. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296-301 (2010); *accord, Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024). This Court is very familiar with these principles, applying them recently in the similar case of *Asterope Shipping Co. v. CSC Sugar LLC*, 757 F. Supp. 3d 349 (S.D.N.Y. 2024) (Rakoff, J.), enjoining a New York arbitration where the resisting party had not agreed to arbitrate.

GERE seeks emergency relief because the ICA has set a May 26, 2026 deadline for GERE to file an Answer in the Arbitration. Under Article 6(8) of the ICC Rules of Arbitration, the Arbitration will proceed notwithstanding GERE's non-participation. Both Hornbeck and the ICA have refused GERE's requests that the Arbitration be stayed to permit this Court to make its determination whether a written agreement to arbitrate was reached. Without immediate intervention by this Court, GERE will be forced to either defend a $25 million claim before a tribunal that lacks contractual jurisdiction over GERE, or to default and allow the Arbitration to proceed in its absence and without GERE's consent—both of which constitute irreparable harm.

## II. STATEMENT OF FACTS

### *1. The Parties' negotiations regarding the M/V BRIARWOOD*

Beginning in or about June 2025, GERE requested Clarkson PLC (trading as "Clarksons"), a vessel chartering broker, to conduct a survey to identify possible vessels available for charter to support offshore work by GERE. Clarksons ultimately identified Hornbeck as having vessels that might be suitable for GERE's use.

After initial discussions regarding other vessels, by October 2025, GERE and Hornbeck were negotiating a potentially acceptable charter offer for Hornbeck's offshore support vessel, the

M/V BRIARWOOD (the "Vessel"). The negotiations were conducted primarily by GERE personnel and Hornbeck personnel directly. At the outset of negotiations and repeatedly throughout, GERE personnel informed Hornbeck that the conclusion of a binding charter would require management approval.

From October 24, 2025 through November 17, 2025, GERE and Hornbeck attempted to negotiate the terms to be offered by Hornbeck to enable GERE to evaluate Hornbeck's proposal. The negotiations were carried out primarily through exchanges of successive negotiating mark-ups of a form agreement published by "BIMCO" (a producer of standard form maritime agreements) known as the "SUPPLYTIME 2017" Time Charter Party for Offshore Support Vessels form (each iteration, a "Negotiating Draft"). Exhibits A through G to the accompanying Declaration of H. Allen Black ("Decl.") are true and correct copies of the negotiation correspondence between Hornbeck and GERE. Decl. Exhibit H is a true and correct copy of the Negotiating Draft (Version 8) as of November 17, 2025, which was an attachment to Hornbeck's Arbitration Demand (as defined below). Decl. Exhibit I is a true and correct copy of the Hornbeck Proposals on Commercial Terms of November 16, 2025.

***2. The Parties exchanged successive drafts of the BIMCO Form without resolving material terms***

Throughout the negotiations, GERE communicated that it had not assented to be bound and would not be bound until specific conditions were satisfied. The later stages of the negotiations proceeded as follows:

- On November 5, 2025, Furic emailed Douglass expressing concern with the status of discussions, stating, "We need to progress and understand if this is working."
- The same day, Douglass responded with substantial edits to GERE's Statement of Work detailing the specifics of the work intended to be accomplished by the Vessel, if

chartered. The issues noted included the operational capabilities of the Vessel to perform the work required,[2] which Party would be responsible for which costs, costs of necessary conversions, health and safety standards, and services to be provided by Hornbeck as the Vessel owner.

- On November 10, 2025, Douglass sent version 5 of the Negotiating Draft to GERE, together with preliminary comments on the financial terms of the proposed charter as Annex D ("Annex D").
- On that same date, Jason Dennis of Hornbeck had a text message chat with Tyler Spofford of GERE, regarding the estimates for preparing the Vessel for use by GERE. In response, Spofford informed Dennis that, "I can understand the need to accelerate for procurement of the materials to build framing, but I don't see that happening till we have a contract or close to one, which means if we take the boat, we may have to start without the grillage."
- On November 13, 2025, Furic emailed Douglass with GERE's comments on the Negotiating Draft, noting a lack of agreement with regard to various commercial and pricing issues, the daily rate to be paid for the use of the vessel (commonly referred to as "charter hire" or "hire") and Hornbeck's request that hire be increased (or "escalated") for various reasons, off-hire terms, the date of delivery, the interest rate, early termination financial terms, mobilization and demobilization terms, cancellation terms, Vessel condition requirements, "owner to provide" terms, liabilities and indemnities, insurance terms, force majeure terms and financials (*e.g.*, when the Vessel

[2] The operational issues under discussion included vessel speed, workability with crew transfer vessels, maintenance of the gangway to permit personnel to move from the Vessel to the work site; electrical systems, provision of gear lockers, and provision of an office for charterer personnel. *See* Decl. Ex. E.

would not be able to perform for causes beyond the reasonable control of the owner), and financial security terms, as well as multiple other issues subject to legal review, with many of the pricing terms proposed in an "Annex D" to the Negotiating Draft.

- On November 16, 2025, Douglass emailed Furic, attaching Hornbeck's proposals on an updated Negotiating Draft, with comments and counter-proposals on the commercial terms, and stating, "Upon resolution, the BIMCO and ANNEX D will require updates and I can send additional comments at that time to formalize the agreements. … Jason would like to also continue the discussion related to modifications – ANNEX D will need to be updated accordingly." The markup to the Negotiating Draft included specific disputes over the same unresolved financial and critical issues noted on November 13.
- On November 17, 2025, Furic emailed Douglass, noting disagreements over numerous important terms, including the pricing issues in Annex D, Hornbeck's requested hire (*i.e.*, pricing) escalation provisions, the delivery date, redelivery provisions, the period of hire, early termination, the interest rate, tax issues, delivery and redelivery terms, mobilization financials, cancellation terms, pre-delivery requirements and preconditions, "owner to provide" terms, off-hire financials, liabilities and indemnities, force majeure financials, and multiple additional issues for legal review.
- The November 17, 2025 response from GERE also included a number of notes conveying that GERE did not intend to enter into a binding charter agreement until various key issues were first resolved, including a notation that discussions on Hornbeck's proposal to escalate charter hire based on changes to its costs were "parked," meaning that further negotiations on charter hire would be tabled until the

resolution of other issues; and a note in connection with pre-delivery preparation that "[GERE] will need confirmation of mobilization work/upgrade to be performed as per expectations before entering the charter party though." The GERE response further objected to Hornbeck's prior markup because it had incorrectly stated that certain matters were "accepted," while GERE did not agree to such provisions.

- Also on November 17, 2025, Douglass emailed to Furic updated cost estimates for mobilization and modification of the Vessel, and a draft "Early Works" letter seeking GERE authorization to procure long lead time materials for the proposed modifications. Notably, Hornbeck's draft letter agreement stated that:

  > Charterers and Owners are engaged in contract negotiations for the M/V HOS BRIARWOOD … The Parties shall continue to use good faith efforts to negotiate a mutually agreeable Time Charter as soon as possible, however, Charterers acknowledge that **the Vessel remains subject to availability as determined by Owners until such time as all details of a Time Charter have been agreed to by Owners**.

  Decl. Ex. G (emphasis added). Hornbeck's draft further stated that the Early Works agreement would terminate "**[u]pon execution of the Time Charter**." *Id.* (emphasis added).

- On November 19, 2025, Douglass texted Furic to check on the status of GERE's updated positions to be provided in another Negotiating Draft. Furic replied, stating in material part, "We understand deadlines. Priority is management decision before the end of the week now. I suggest we finalise contract once we have management confirmation to proceed with your offer. I still have in mind to propose a call on Friday but expect feedback from Tyler [Spofford] tomorrow before."

- On or about November 20, 2025, Jason Dennis of Hornbeck contacted Tyler Spofford of GERE to ask what else Hornbeck could do to reach an agreement on the proposed charter.
- On November 21, 2025, in response to inquiries from Douglass regarding the state of negotiations and GERE's counter-proposals or agreements, Furic emailed Douglass that "we have not been able to take clear decision today. I keep you posted asap early next week."
- On November 26, 2025, in a conference call between GERE and Hornbeck, GERE advised that it was considering another offer. As the conference was closing, Adam Shrives of Hornbeck stated to GERE's representatives, in substance, that "unless you want to let us make another offer, it seems like your minds are made up."

The Parties at no time executed any version of the Negotiating Draft, or any "fixture recap," signed term sheet, or other executed writing evidencing any agreement to form a charter, or to agree to arbitration. GERE was seeking to confirm Hornbeck's offer for management review, and acted consistently with that intent. It did not nominate the Vessel for any voyage or service, did not pay any mobilization fee, hire, or other consideration to Hornbeck, and did not direct or accept the performance of any services by Hornbeck.

***3. Hornbeck sought to force dispute resolution under the draft charter form***

On December 8, 2025, Hornbeck wrote to GERE, claiming for the first time that a time charter had been concluded subject to minor terms. Decl. Ex. J. Hornbeck wrote GERE again on December 16, 2025, to demand implementation of the dispute resolution clause in the unsigned, unagreed Negotiating Draft. Decl. Ex. K.

On December 31, 2025, counsel for GERE responded to Hornbeck, explaining its position that no charter contract had been reached and declining Hornbeck's demand for a meeting, but offering to discuss the matter between counsel in the hopes of a resolution. Decl. Ex. L.

On March 2, 2026, counsel for Hornbeck emailed GERE to advise that Hornbeck was pressing ahead with the draft dispute resolution clause from the unsigned, unagreed Negotiating Draft, and stating that "the next step under the BIMCO charter is to mediate this dispute under the International Chamber of Commerce's Mediation Rules." Decl. Ex. M. Hornbeck's counsel encouraged GERE to participate in the proposed ICC mediation. *Id.* On March 6, 2026, counsel for Hornbeck emailed GERE to advise of Hornbeck's submission of a request for mediation. Decl. Ex. N.

On March 9, 2026, counsel for GERE emailed Hornbeck to reiterate GERE's position that the Parties' negotiations never reached an agreement to be bound, or sufficient to create a fixture, and therefore the unilateral request for ICC mediation, premised on the existence of such an agreement was, at best, inaccurate and premature. Decl. Ex. O. GERE's counsel requested that Hornbeck's counsel identify the specific communication on which Hornbeck relies to establish that GERE had accepted a fixture of the Vessel and agreed to be bound to the alleged charter, stating that such information would provide clarity on the basis for Hornbeck's position and that GERE's counsel would be pleased to talk through the issues with Hornbeck's counsel in the hopes of avoiding unnecessary litigation.

That evening, on March 9, 2026, counsel for Hornbeck responded that Hornbeck's position was based on a review of the Negotiating Draft and his conclusion that "perhaps as little as two" non-essential terms remained open. Decl. Ex. P. He expressed a general willingness to discuss but declined to postpone the ICC mediation process that Hornbeck had initiated. *Id.*

On March 13, 2026, counsel for GERE emailed counsel for Hornbeck to remind him that whether parties have agreed to submit a particular dispute to arbitration is an issue for judicial determination, so therefore if Hornbeck wished to compel mediation and/or arbitration, the proper forum would be a federal district court. Decl. Ex. Q. Counsel also advised that GERE would respond to the ICC to dispute that GERE had agreed to arbitration. *Id*.

That same day, GERE notified the ICC that GERE did not agree to ICC mediation with Hornbeck. Decl. Ex. R. On March 17, 2026, the ICC wrote the Parties to advise that because the Parties did not agree to mediation, the request for mediation was closed.

On April 10, 2026, counsel for Hornbeck left a voicemail for counsel for GERE noting his understanding that GERE did not agree that there was a contract between it and Hornbeck, and offering to proceed in the Eastern District of Louisiana or before the ICC.

On April 20, 2026, counsel for Hornbeck emailed GERE to advise that Hornbeck had initiated an arbitration with the ICC. Decl. Ex. S. On April 24, 2026, GERE received a letter from the ICA advising that Hornbeck had initiated an arbitration against GERE, requiring an answer within 30 days. Decl. Ex. T. Attached to the correspondence was Hornbeck's Request for Arbitration (the "Arbitration Demand"). Decl. Ex. U.

The Arbitration Demand concedes that "the parties did not sign a written agreement" and rests Hornbeck's demand for arbitration on an allegation that the Parties had "reached an enforceable verbal contract." Decl. Ex. U at ¶ 10. The Arbitration Demand further alleges that, "[b]y November 14, 2025, the parties had concluded the essential terms of the charter party, … the vessel, charter commencement date, charter duration, and day rate." *Id*. Hornbeck later concedes in the Arbitration Demand that, after that date, the Parties continued to negotiate the day

rate and "circulated an updated pricing sheet reflecting the new, discounted rate." Decl. Ex. U at ¶ 38.

The Arbitration Demand accordingly seeks arbitration under the ICC Rules of Arbitration, with New York, New York, as the seat of arbitration, on the basis of the dispute resolution provisions in the unexecuted Negotiating Draft and an alleged oral agreement. Decl. Ex. U.

#### *4. Hornbeck and the ICA refused to voluntarily stay the arbitration*

On April 30, 2026, counsel for GERE wrote to counsel for Hornbeck to note the receipt of the Request for Arbitration filed with the ICA and the lack of evidence of an agreement between the Parties, and to again encourage Hornbeck to "simply identify the evidentiary basis on which it relies for its claim and sit down with GERE to resolve this dispute reasonably." Decl. Ex. V. Counsel further noted that:

> With regard to the proper forum for this dispute, as discussed in our earlier letter, the question of whether an arbitration agreement was made is one that can only be resolved by a court pursuant to Section 4 of the Federal Arbitration Act and well-established precedents from the Supreme Court to district courts. In such a forum, in addition to the benefits of discovery under the Federal Rules of Civil Procedure, Hornbeck's representations in pleadings will be subject to Rule 11's requirement that any factual contentions have evidentiary support, at the risk of sanctions on the signatory attorney, law firm, and party for the failure to have such support.

*Id.*

That same day, GERE also wrote to the ICA to request that the arbitration proceeding be stayed. Decl. Ex. W. GERE explained that it disputes having entered into any arbitration agreement with Hornbeck. GERE further noted that while the ICC Arbitration Rules provide that the question of whether an enforceable arbitration agreement exists may be determined by the arbitration panel or be referred to the ICA for decision pursuant to its Rules 6(3) and 6(4), that is not the law under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"), or the precedents of the U.S. Supreme Court and the Southern District of New York.

On May 1, 2026, counsel for Hornbeck responded by email that Hornbeck would be willing to mediate, but only in parallel with the arbitration with no stay of the proceedings. Decl. Ex. X.

On May 7, 2026, the ICA responded by email to GERE's request for a stay of the proposed arbitration by stating as follows:

> If any party against which a claim has been made does not submit an Answer, the arbitration will proceed and the arbitral tribunal will decide any question of jurisdiction or of whether the claims may be determined together, unless the Secretary General refers the matter to the Court for its decision (Article 6(3)). Furthermore, if any party refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure (Article 6(8)).
>
> We understand that Respondent is raising a plea pursuant to Article 6(3). A decision will be taken on Respondent's pleas pursuant to Article 6(3) upon payment of the provisional advance. Please do not file any submissions or comments until we inform you of the decision pursuant to Article 6(3).
>
> **Answer to the Request for Arbitration**
>
> Without prejudice to Claimant's comments requested above, we refer to our correspondence dated 24 April 2026 and look forward to receiving Respondent's Answer by 26 May 2026 (Article 5(1)).

*See* Decl. Ex. Y. The ICA followed up that response on May 12, 2026, again stating that if GERE does not file an answer by May 26, 2026, then the arbitration will proceed, with the arbitration panel, or the ICA, deciding the "arbitrability" of the matter. *See* Decl. Ex. AA.

In short, the ICA refused to stay the pending arbitration, and further stated its intent to decide by itself the question of whether the dispute between Hornbeck and GERE is arbitrable, notwithstanding having been advised of the unequivocal law that the question of who is to decide whether a matter is arbitrable is referred by the FAA to a federal district court of competent jurisdiction unless there is a **<u>clear and unequivocal agreement</u>** to refer such a decision to arbitration. *See, e.g., First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995).

The ICA further stated that it was requiring GERE to provide a full Answer to Hornbeck's Arbitration Demand, with its exhibits, and to state its request with regard to the number of arbitrators, <u>*before*</u> the ICA would even consider a request for a stay of its proceedings.

## III. ARGUMENT

### ***1. The standard for a temporary restraining order and preliminary injunction***

A party seeking a Temporary Restraining Order ("TRO") or preliminary injunction must show: "(1) irreparable harm in the absence of the injunction; and (2) either: (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor." *See NASDAQ OMX Grp., Inc. v. UBS Sec. LLC*, 957 F. Supp. 2d 388, 402 (S.D.N.Y. 2013); *see also Merrill Lynch Inv. Managers v. Optibase Ltd.,* 337 F.3d 125, 129 (2d Cir. 2003). The same standard applies to temporary restraining orders and preliminary injunctions. *Basank v. Decker,* 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020).

### ***2. The Court is to decide whether a binding arbitration agreement was formed***

In *Granite Rock Co. v. International Brotherhood of Teamsters*, the Supreme Court confirmed that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." 561 U.S. 287, 299 (2010). "[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Id.* at 296.

The Supreme Court recently reaffirmed this principle in *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024), explaining that before referring a matter to an arbitrator, a court determines whether a valid arbitration agreement exists. *Id.* at 149. The Court stated:

> Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter.
>
> We ask who has the power to decide arbitrability because a party who has not agreed to arbitrate will normally have a right to the court's decision about the merits of its dispute. Thus, we have explained that courts should not assume that the parties agreed to arbitrate arbitrability **unless there is clear and unmistakable evidence that they did so**. Before referring a dispute to an arbitrator, therefore, **the court determines whether a valid arbitration agreement exists**.

*Id*. at 149 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995) and *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 69 (2019)) (emphasis added) (internal quotations and citations omitted).

In the recent case of *Asterope Shipping*, this Court enjoined a New York arbitration where the resisting party had not agreed to arbitrate, observing that "[t]he question of whether parties have submitted a particular dispute to arbitration, *i.e.,* the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." 757 F. Supp. 3d at 356 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (citations omitted).

Notwithstanding that law, the ICC Rules of Arbitration provide that questions of jurisdiction are to be decided directly by the arbitration tribunal, unless the ICA Secretary General refers the matter to the ICA for its decision. ICC Rules arts. 6(3), 6(4). In cases addressing those ICC Rules, the Second Circuit has noted that only when the parties had actually entered into a written agreement to arbitration under the ICC Rules for Arbitration would that constitute "clear and unmistakable" evidence of an agreement to delegate arbitrability questions to the ICA. *See, e.g., Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003); *see also Olin Holdings Ltd. v. State,* 73 F.4th 92, 105 (2d Cir. 2023).

Where, as here, a party disputes that it has entered into any agreement to arbitrate, the court, not an arbitrator, is the tribunal to decide whether the party has consented to arbitration at all; "[q]uestions concerning the formation and existence of an arbitration agreement must be resolved by the courts in the first instance." *Olin Holdings*, 73 F.4th at 101; *see also Coinbase, Inc. v. Suski*, 602 U.S. at 150 (when the dispute is "whether there is an agreement to arbitrate … , per usual, that question must be answered by a court."); *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, No. 11 Civ. 0198, 2014 WL 4928929, at *2 (S.D.N.Y. Oct. 2, 2014), *aff'd*, 605 F. App'x 59 (2d Cir. 2015). In *VRG*, following the Second Circuit's remand instructions, the court explained that if the resisting party did not agree to the arbitration clause incorporating ICC Rules, then "no further analysis would be necessary," as that finding alone would "compel[s] the denial of [the] petition [to compel arbitration] … on the grounds that [the resisting party] never consented to submit disputes — whether about arbitrability or anything else — to arbitration." *VRG,* 2014 WL 4928929 at *2.

Accordingly, Hornbeck cannot bootstrap its way into an arbitration of the arbitrability of its dispute on the basis of the disputed allegation of a contract with an arbitration clause. Whether such a contract was ever reached is a matter for this Court, not the ICA.

***3. GERE is likely to succeed on the merits because there was no meeting of the minds between Hornbeck and GERE***

GERE is likely to succeed on the merits of its claim that no contract, and accordingly no arbitration agreement, was ever formed between the Parties. The threshold requirement of contract formation is a mutual manifestation of assent to be bound. In *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, the Second Circuit explained that the dispositive question in maritime contract formation is "whether there was a meeting of the minds sufficient to constitute a contract." 241

F.3d 135, 145 (2d Cir. 2001). Whether parties have reached a meeting of the minds is a question of fact, assessed on the totality of the circumstances. *Id.*

The facts here refute any claim of a meeting of the minds. Throughout the negotiations, GERE, repeatedly in writing and on the face of the very document Hornbeck claims is binding, maintained that it was *not* yet bound and would not be bound until specific conditions were satisfied. GERE never communicated acceptance or confirmation of any agreement.

Likewise, Hornbeck also confirmed that it did not intend to be bound and the Vessel would be "subject to availability" until all details of the proposed charter had been agreed. Hornbeck also expressly confirmed its understanding that the charter would not be fixed until "execution of the Time Charter." Decl. Ex. G.

Further, Hornbeck's own pleading concedes that the Parties had no signed agreement and no clear point of mutual assent, and further evidences that the Parties never reached agreement on the commercial and financial terms of the proposed charter.

***a. GERE repeatedly communicated that it did not intend to be bound until a complete agreement was reached***

Even leaving aside both Parties' express statements that they would not be bound until formal acceptance of a charter, GERE's lack of assent is clear from the Negotiating Draft on which Hornbeck relies to claim an agreement. Throughout version 8 of the Negotiating Draft and its predecessor iterations, GERE inserted marginal comments and drafting markers indicating that GERE did not intend to be bound and would not be bound until the form was complete. For example, GERE expressly noted: "GERE will need confirmation of mobilization work/upgrade to be performed as per expectations *before entering the charter party though*." Decl. Ex. H. (emphasis added). GERE's comment is a written, contemporaneous statement on November 17,

2025, that GERE would not agree to the proposed charter until it had confirmation that the work needed to prepare the Vessel for service under charter would meet GERE's requirements.[3]

#### *b. GERE Never Communicated Any Acceptance or Confirmation of a Fixture*

A central feature of maritime contract formation is the customary "fixture recap," a written communication that captures the parties' agreement on the main terms of the charter. The Second Circuit has explained: "A recap communication, or fixture, is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *U.S. Titan,* 241 F.3d at 148 (internal citations omitted).

Here, there is no email, text, letter, or other writing from GERE accepting Hornbeck's offered terms. GERE never sent a "fixture recap," never wrote that the parties had "a deal," never executed the BIMCO Form, never paid any consideration, and never accepted or directed any performance under the alleged charter. Indeed, despite GERE's repeated requests that Hornbeck identify any such fixture recap on which Hornbeck relies for its claim of a fixture, Hornbeck failed to do so. Decl. Exs. O, Q, V. An affirmative acceptance, communicated by the counterparty in writing, is the basis in virtually all cases finding agreement to a fixture. *See, e.g., Great Circle, supra,* 681 F.2d at 123 (referencing a telex from charterers stating, "accept owners last offer" and "So we fixed sub (subject to) details").

No analogous acceptance was communicated here. Indeed, the record shows the opposite. On November 21, 2025, one week after Hornbeck's claimed fixture date, GERE's representative wrote to Hornbeck: "we haven't been able to take clear decision." Decl. Exs. B, U; Hornbeck Req. for Arb. ¶ 46. On November 17, 2025, the negotiation participants confirmed in a

[3] Whether the mobilization work would meet GERE's expectation was one of many critical terms on which GERE's agreement to the proposed charter would depend.

contemporaneous text exchange that procurement could not proceed "till we have a contract or close to one." Decl. Ex. F.

### *c. The maritime fixture doctrine requires agreement on a charter's essential terms*

The United States Court of Appeals for the Second Circuit has noted that "a charter party is merely a contract, subject to all the rules and requirements of contract law," and "[w]hether there was a meeting of the minds resulting in a charter party is a question of fact." *Great Circle*, *supra*, 681 F.2d at 125.

Cases involving charter disputes over refer to the *Great Circle* case, in which the court explained the "fixture" custom of the shipping industry by noting that shipping industry dealings "are usually conducted with a sense of urgency under severe time constraints." *Great Circle*, 681 F.2d at 125. In such cases, charters are formed in two stages. First, the negotiation through brokers of "main" terms, referring to the ship, the time and place of delivery, duration of charter, redelivery, hire rate, the printed form on which the contract is to be based, and "any other term that a party deems important." *Id*. When agreed, the "main" terms are agreed through a "fixture." Then, after the fixture is agreed, the parties negotiate "details," the minor or side issues to flesh out the agreement. *Id*.

However, where a party communicates "an intent not to be bound until [it] achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *accord R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984). Such an approach is more common where, as here, charter negotiations are not urgent, but involved prolonged, detailed negotiations over virtually all aspects of the potential arrangement.

### *d. No fixture was reached on the main terms of a charter*

GERE made clear to Hornbeck that it was not prepared to enter into a binding charter agreement unless and until the "main" terms were resolved and internal management approval was obtained. Hornbeck's own Request for Arbitration confirms the absence of any meeting of the minds. Hornbeck concedes that "the parties did not sign a written agreement." Decl. Ex. U ¶ 10.

Hornbeck rests its claim instead on an alleged "verbal contract (which was confirmed in material part in writings exchanged between the parties)." *Id.* Hornbeck goes on to claim that by November 14, 2025, the Parties had "concluded the essential terms of the charter," specifically with regard to the charter commencement date, charter duration, and day rate. *Id.* ¶ 36.

However, the Negotiating Draft and the associated correspondence during the period November 16-17, including Hornbeck's draft "Early Works Agreement," contradict that assertion. Hornbeck's proposals on commercial and financial terms, made November 16, 2025, show that the Parties had not reached an agreement on the critical issue of how much GERE would need to pay for the daily hire and other matters.

- The parties had not agreed on the pricing for the contemplated charter; with disagreements over the base rate and Hornbeck proposing various supplemental charges and escalation of hire under certain conditions,

- Likewise, the parties had not reached agreement on the pricing of contingencies, from equipment failures to Force Majeure to early termination.

*See* Decl. Ex. I.

In addition, the Negotiating Draft and correspondence also shows that other essential financial and commercial main points were clearly not agreed upon, including the following:

- Box 5 (charter commencement date) – Although Hornbeck's marginal note stated "agreed and closed in Nov. 13 meeting, GERE's response noted that it was not, and reiterates its prior demand for a clear delivery date.

- Box 9 (charter duration) – Hornbeck amended from 10 months to "12 months Firm."

- Box 13 (Early termination) – GERE noted disagreement regarding termination terms and fee applicable in the event of a stop work order from the U.S. government, a particularly critical issue in light of the current administration's efforts to terminate offshore wind development.[4]

- Box 25 (Interest rate) – GERE rejected Hornbeck's demand for interest at 1.5% per month, compounded monthly, and proposed 1.5% per year.

- Box 31 (Taxes) – GERE disagreed with Hornbeck's language regarding responsibility for taxes.

- Clause 2 (a)(iii) (Liquidated damages for late delivery) – Hornbeck identified the clause as reserved for further review depending on final commercial agreement; GERE insisted on inclusion of the clause.

- Clause 2(b) (Mobilisation) – Hornbeck stated that the terms for payment of a mobilization fee were not commented on and therefore agreed, but in its response, GERE noted that it had several times stated that it would not accept lump-sum terms and states that the terms are to be included in the commercial terms to be set out in an updated Annex D.

- Clause 2(c) (Cancelling) – GERE did not agree on the wording as edited by Hornbeck.

- Clause 5(b) (Pre-delivery) – GERE noted, "[GERE] will need confirmation of mobilization work/upgrade to be performed as per expectations before entering the charter party though," a critical issue to determine whether the Vessel would be suitable for GERE's use in the first place.

- Clause 9 (Charterers to provide regarding the costs of offshore transportation) – GERE did not agree with inclusion of costs for transport of Owner personnel, provisions, vessel equipment, etc.

- Clause 12(c) (Adjustments to Hire, regarding escalation) – Hornbeck noted that at the November 13 meeting, GERE had objected to Hornbeck's proposed escalation terms; Hornbeck referred to a "counter-proposal in separate Excel file."

- Clause 12(d) (Invoicing) – While not apparently applicable to this clause, GERE noted that Hornbeck's proposal to increase Daily Charter Hire by $3,000K after a firm period of hire would be "Parked" (meaning that discussions on the proposed additional charter

[4] Both Parties were well-aware that on January 29, 2025, the new federal administration had issued a Presidential Memorandum directing federal agencies to, *inter alia*, review wind leasing and permitting practices for offshore wind projects. *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 29, 2025). The government subsequently issued stop work orders in connection with multiple offshore wind projects, including the Empire Wind, Revolution Wind, Sunrise Wind, and Coastal Virginia Offshore Wind projects. *See, e.g., Empire Leaseholder LLC v. Burgum*, D.D.C. Case No. 26-cv-00004; *Revolution Wind, LLC v. Burgum*, D.D.C. Case No. 25-cv-2999; *Sunrise Wind LLC v. Burgum*, D.D.C. Case No. 26-cv-00028; *Va. Elec. & Power Co. v. United States*, E.D. Va. Case No. 25-cv-00830.

hire would be tabled pending the resolution of other critical issues – resolutions that were never reached).

- Clause 13 (Off-hire) – Hornbeck insisted on its proposal for partial off-hire terms and costs in the case of equipment failures; but noted that GERE had indicated it could accept a limited period of partial off-hire, but with the Vessel fully off-hire if repairs are not done or if a port call would be needed for repairs, Hornbeck noted that this significant financial and performance issue needed to be further clarified. Hornbeck's notes of "agreement" in connection with off-hire due to gangway, crane, and other breakdown issues were also belied by GERE's comments and Hornbeck's own counter-proposals.

- Clause 13 (Performance standards) – Hornbeck had deleted the requirement that the Vessel meet key performance indicators or be placed off-hire; Hornbeck noted that "GE requests reinsertion. [Hornbeck] to revert"; another key performance and financial issue.

- Clause 14(g) (Owner's damage liability) – Hornbeck reserved the issue of its liability exposure terms for discussion, "particularly the amount of the deductible."

- Clause 35 (Force Majeure) – Hornbeck noted that GERE had proposed a cap on the payment of charter hire during events of Force Majeure, and states that it was making a proposal in a separate Excel file. GERE responded, noting that "HOS proposal is not understood. Any party can terminate. 50% of hire is during the FM event and 30 days is the duration of FM event from when it is possible to terminate."

GERE also noted multiple issues for legal review.

Accordingly, the documents on which Hornbeck bases its claim of a binding charter agreement show that the Parties had clearly **not** agreed on critical commercial and financial terms for the proposed charter, including the commencement date, duration, or charter hire, proposed charter hire escalation terms, liquidated damages, off-hire conditions and financial terms, Force Majeure financial terms, or vessel performance standards. The comments also reflect a number of areas that Hornbeck claimed to be "agreed," only to be corrected by GERE. They also reflect a number of financial terms that Hornbeck itself acknowledges are still being negotiated.

***e. Hornbeck cannot identify any "fixture" communication***

Hornbeck's only specific allegation of communication of fixture in its Arbitration Demand is the allegation that, at some point during a November 18, 2025 call, GERE's Pierre Furic

allegedly stated, "we have a deal." Decl. Ex. U ¶ 39. That claim is contested by Furic and is contradicted by the contemporaneous written records from the same week. It is also irrelevant, given Hornbeck's own contemporaneous statement that it would require execution of a Time Charter to reach a fixture. Decl. Ex. G.

When Hornbeck's Kevin Douglass pressed Furic on the status of GERE's latest counter-proposals after the November 18 conference, Furic texted Douglass, stating, "We understand deadlines. Priority is management decision before the end of the week now. I suggest we finalize contract once we have management confirmation to proceed with your offer."

Hornbeck's allegation is further not credible considering that GERE had been contacted by an alternative vessel provider on November 13, 2025, with a competitive offer. Furic was aware of that alternative proposal but continued to work with Hornbeck to finalize Hornbeck's offer for consideration.

Hornbeck's own personnel were aware that no agreement had been reached. On November 20, 2025, Hornbeck's Jason Dennis called GERE's Tyler Spofford to ask what else Hornbeck could do to close an agreement on the proposed charter, to which Spofford deflected.

Furic subsequently emailed Douglass on November 21, 2025, "we haven't been able to take clear decision." Decl. Ex. U ¶ 46. The Parties ultimately arranged a conference for November 26, 2025, for GERE to inform Hornbeck whether they had management approval to continue with Hornbeck or would proceed with an alternate vessel provider.

The clear lack of agreement is not refuted by Hornbeck's claim in its Arbitration Demand that the broker who identified Hornbeck's Vessel to GERE and who would not receive a commission without a charter, allegedly "reassured [Hornbeck] that the parties had a deal" on November 24, 2025. Decl. Ex. U ¶¶ 25, 47-48. Even if the broker had offered such an opinion,

he had no authority to bind GERE and did not conduct the detailed negotiations for GERE. Any such self-interested "reassurance," if made, does not contradict the record of the negotiations recounted above, or the law of contract formation.

***f. In light of the lack of agreement, no fixture was reached***

Accordingly, no fixture was reached here. As noted above, GERE made clear to Hornbeck that it was not prepared to enter into a binding charter agreement until it had resolved various issues with Hornbeck and received management approval. GERE never issued any recap or fixture assenting to essential terms of the proposed charter. Indeed, it could not do so. Each of the main terms identified in *Great Circle* — hire, delivery, redelivery, mobilization — remained open, as did numerous other important terms, including commercial terms regarding changes to hire, off-hire provisions, standards of performance, liability terms, and more.

***4. GERE will suffer irreparable harm absent immediate relief***

The Second Circuit has held that a party suffers irreparable harm as a matter of law when "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Optibase*, *supra*, 337 F.3d at 129. *see also Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 985 (2d Cir. 1997) (affirming preliminary injunction enjoining arbitration where dispute was not arbitrable and holding that the plaintiff would suffer irreparable harm if forced to expend time and resources arbitrating an issue that was not arbitrable and for which any award would be unenforceable). Courts emphasize that arbitration is a matter of consent, not coercion, and compelling arbitration without agreement undermines this principle. *UBS Sec. LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011); *NASDAQ OMX Grp., Inc. v. UBS Sec. LLC*, 957 F. Supp. 2d 388, 402 (S.D.N.Y. 2013).

Unless Hornbeck is enjoined from pursuing its claims in arbitration, GERE faces precisely this harm and faces it imminently. The ICC has set a deadline of May 26, 2026, for GERE to file

an Answer to Hornbeck's Request for Arbitration. Hornbeck claims approximately US$25,000,000 in damages. Under Article 6(8) of the ICC Rules of Arbitration, "if any party refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure." GERE must therefore either appear in the Arbitration and incur those costs, or default and allow the Arbitration to proceed in its absence with the prospect of an award entered without GERE's participation or consent.

GERE has already exhausted efforts to persuade Hornbeck to stay its demanded arbitration to either negotiate a resolution to this matter or obtain a resolution of the "arbitrability" issue in this Court, having multiple times sought to engage Hornbeck in a good-faith discussion of the facts of the matter. Likewise, GERE has exhausted potentially available ICA institutional remedies before turning to this Court.

GERE objected to the ICA's assertion of jurisdiction over the issue of "arbitrability" by letter dated April 30, 2026, and respectfully requested that the ICA stay the proposed arbitration. Decl. Ex. W. However, the ICA declined to grant a stay, instead directing GERE to submit an Answer to Hornbeck's Arbitration Demand, including any evidence, and only then would the ICA consider a stay. At the same time, the ICA advised that notwithstanding GERE's objection, it proposed to determine the issue of arbitrability itself, i.e., whether GERE and Hornbeck had agreed to mediation of Hornbeck's claim. Accordingly, GERE must now seek this injunctive relief to prevent the imminent and irreparable harm of being forced to arbitrate a dispute it has not agreed to arbitrate, and the loss of its procedural and substantive rights to judicial adjudication.

***5. The balance of equities and the public interest favor injunctive relief***

A stay of the Arbitration pending judicial resolution of the arbitrability question imposes minimal cognizable harm on Hornbeck. Hornbeck's claim, if meritorious, can be pursued in this Court through GERE's declaratory judgment action; if Hornbeck establishes that an agreement to

arbitrate exists, the Arbitration can resume. By contrast, GERE faces being forced into arbitration without a contractual basis, and with substantial costs. GERE's harm is immediate and concrete; any harm to Hornbeck from a brief stay would be speculative and procedural.

The equities also favor GERE in light of the parties' relative postures throughout the dispute. GERE has at no point refused to engage with this matter substantively. GERE has invited Hornbeck, repeatedly, in writing, since November 2025, to produce any documentation supporting Hornbeck's claim of a binding agreement, and to discuss any such documentation in good faith. Hornbeck has refused to engage with that invitation. Instead, Hornbeck has pursued ICC mediation and arbitration without ever providing the documentation GERE requested. To the extent Hornbeck suggests that GERE has avoided resolution of the dispute, the record shows the opposite: it is Hornbeck that has refused to engage with GERE's standing invitation to substantiate the alleged agreement, choosing instead to file successive ICC proceedings and demand GERE's submission to a tribunal that lacks contractual jurisdiction.

The public interest also favors injunctive relief. The Supreme Court has made clear that the FAA's policy in favor of arbitration does not override "the principle that a court may submit to arbitration 'only those disputes…that the parties have agreed to submit." *Granite Rock Co.,* 561 U.S. at 302. "Arbitration is strictly 'a matter of consent,'" and thus "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* at 299. If the parties have not consented to arbitrate a claim, the district court is not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right. *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011).

Here, the public interest favors enjoining arbitration unless and until a court determines whether the Parties consented to arbitration.

### *6. A nominal bond is appropriate*

FRCP 65(c) provides that "[t]he court may issue a preliminary injunction or a TRO only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond is committed to the Court's discretion. *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). A nominal bond is appropriate here. Hornbeck cannot identify any concrete out-of-pocket loss it would suffer from a brief stay of the Arbitration pending judicial resolution of the threshold formation question. Where there is a small likelihood of harm to the enjoined party, a nominal bond or dispensing of a bond altogether satisfies Rule 65(c). *Id.*; *see also Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (holding that district courts have wide discretion to set the bond at zero or a nominal amount).

## IV. CONCLUSION

GERE respectfully requests that the Court grant a TRO pending the hearing on this Order to Show Cause; convert that TRO into a preliminary injunction upon conclusion of the hearing; declare that GERE has no obligation to arbitrate with Hornbeck; and award GERE the costs and fees associated with the prosecution of this action, including reasonable attorneys' fees, together with such other, further, or different relief as this Court deems just and proper in the circumstances.

Dated: May 20, 2026

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Aldo A. Badini*

Aldo A. Badini
200 Park Avenue
New York, NY 10166-4193
ABadini@winston.com

**MILLS BLACK LLP**

Thomas L. Mills
H. Allen Black
1215 19th Street, NW
Washington, DC 20036
TMills@millsblack.com
HAblack@millsblack.com

*Counsel to Petitioner*

CC: International Court of Arbitration (via email)
Daniel Charest, Counsel to Hornbeck (via email)

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c), I hereby certify that the foregoing memorandum of law is twenty-five pages, and contains 8,067 words, exclusive of the caption, table of contents, table of authorities, and signature block, as counted by the Microsoft Word software used to prepare this document.

Dated: May 20, 2026

*/s/ Aldo A. Badini*
Aldo A. Badini