UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GE RENEWABLES US LLC,<br><br>Petitioner,<br><br>v.<br><br>HORNBECK OFFSHORE OPERATORS LLC,<br><br>Respondent. | Civil Action No. 1:26-cv-04014-JSR |

**RESPONDENT HORNBECK'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER GE'S MOTION FOR ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**[1]

## I. INTRODUCTION

Petitioner GE Renewables US LLC ("GE") reached a fixture for GE to charter m/v HOS BRIARWOOD, an offshore services vessel suitable to service GE's Vineyard Wind 1 offshore wind project, from Hornbeck, starting December 15, 2025, to be delivered at New Bedford, Massachusetts, for a twelve-month duration (plus an option to extend), on a $[redacted] day rate, with redelivery at New Bedford, Massachusetts, using an industry-standard form charter, called the BIMCO SupplyTime 2017. GE cannot validly deny these central facts. Nor can GE deny that, after further discussions pertaining to the details of the charter ran their course to an agreement even on the details (save and except cleaning the redlined document—a task GE had agreed to handle—

[1] By opposing GE's motion, both in this response and at the May 22, 2026 oral argument, Hornbeck does not waive, and indeed expressly preserves, any objections it may have to personal jurisdiction, venue, or GE's invocation of admiralty jurisdiction. *See Shanghai Zhenglang Tech. Co. v. Mengku Tech. Co.*, No. 20-CV-5209, 2020 WL 7481297, at *1 n.1 (E.D.N.Y. Dec. 18, 2020) ("Through defending the motion for a preliminary injunction, Defendants did not waive their rights to object based on personal jurisdiction, venue, and or service of process.").

and signing the final version), GE's head negotiator, Pierre Furic, confirmed to Hornbeck, "We have a contract!" Nor can GE deny that its broker, Tyler Boje, likewise confirmed that a fixture had been reached on multiple occasions.

But, as the time to take delivery of HOS BRIARWOOD approached, GE began—for the first time—to express doubt about the transaction. GE slow-played the conclusion of the details. GE began to express a need for higher internal review. In reality, Hornbeck came to learn that GE had obtained a different vessel from a competitor to service its Vineyard Wind 1 project. And, now, GE seeks to use the lack of a final form written agreement as an escape hatch from its contractual obligations.

Maritime law does not permit GE's actions. Nor should the Court reward GE's behavior. Under well-settled Second Circuit law, a charter party need not be in writing; fixture of the main terms (i.e., vessel, charterer, owner, hire rate, duration, delivery and redelivery location) creates a binding agreement. Without question, Hornbeck and GE agreed on each of those terms. The remaining issues GE now seeks to characterize as "essential" are precisely the kind of secondary details that are negotiated after fixture. Because GE and Hornbeck achieved a fixture to charter HOS BRIARWOOD, GE has no chance of success on the merits, so its motion should be denied.

Beyond failing to establish that it is likely to succeed on the merits of its claim, GE also fails to make a showing of the remaining injunctive relief factors. It cannot show irreparable harm: the imminent deadline GE invokes is a deadline of its own making (or, at least, a deadline GE has not sought to move). Moreover, on the issue of irreparable harm, the ICC Rules expressly authorize the arbitral tribunal to award attorneys' fees and costs to the prevailing party, meaning that any harm GE suffers from participating in arbitration is fully compensable and, under Circuit precedent, not irreparable. Further, the balance of equities and public interest cut decisively against

enjoining arbitration. GE will suffer no harm by continuing to participate in arbitration proceedings, and enjoining the proceedings would harm Hornbeck by stripping it of the parties' contractually chosen venue. And the public interest supports an alternative dispute process specifically designed to advance the resolution of disputes like this one. GE has failed to meet the extraordinary burden imposed on a party seeking injunctive relief. The Court should deny GE's motion.

## II. BACKGROUND

Hornbeck owns and operates a large fleet of various types of vessels that it charters to a variety of maritime customers. In this setting, GE is a provider of turbine, generator, and other renewable energy equipment and services. In June 2025, GE contacted Hornbeck through its broker, Clarksons, to discuss chartering a vessel for the Vineyard Wind 1 project, a utility-scale offshore wind energy project off the coast of Massachusetts serviced by GE. Over the next months, the parties began drafting a charter party using a BIMCO SupplyTime 2017 charter party form.[2]

On October 7, Hornbeck sent GE a proposal for HOS BRIARWOOD, one of Hornbeck's offshore support vessels. Dennis Decl. Ex. A. The proposal included a delivery date of December 15, 2025; a charter term of either twelve or thirty-six months; a day rate of $[redacted], which reflected housing for up to thirty-six GE related personnel on board;[3] and the port of delivery and redelivery as New Bedford, Massachusetts. *Id.* On October 21, Jonathan Lints of Clarksons advised Hornbeck that GE's "offshore vessel needs" were "becoming clearer" and that "using the Hos Briarwood is

[2] BIMCO SupplyTime 2017 is a standardized time charter for offshore support vessels generated by the Baltic and International Maritime Council ("BIMCO"), an international shipping association representing vessel owners.

[3] One of the anticipated services to be provided by HOS BRIARWOOD was to provide offshore housing and hotel services for GE-related individuals working on the Vinyard Wind 1 project. In the proposal, for every eight passengers in excess of thirty-six, the day rate increased by $[redacted].

[GE's] Plan A." Shrives Decl. Ex. B.[4] At this point, the parties began negotiating in earnest for a charter party of HOS BRIARWOOD.

Over the next month, Hornbeck and GE were in near daily communication to finalize the charter party prior to the anticipated charter start date. The parties had frequent meetings, sent frequent emails and messages about the negotiations, and exchanged one edited version of the BIMCO SupplyTime 2017 form (the "BIMCO Charter") after another as the parties agreed to provisions and as GE's offshore vessel needs crystalized. Shrives Decl. at ¶ 9. Hornbeck and GE met on October 23 and October 24 to review and discuss the terms of the charter party. Shrives Decl. at ¶ 10. On October 31, Furic circulated an updated draft of the BIMCO Charter which listed the vessel as HOS BRIARWOOD; the delivery date as "circa 15th December 2025, TDB;" the term as ten months; and the port of delivery and redelivery as New Bedford, Massachusetts. Shrives Decl. Ex. C.

The pace of negotiations accelerated in early November. On November 5, Kevin Douglass of Hornbeck circulated the Scope of Work with Hornbeck's comments and edits, noting that "[w]e are meeting with Executive Management on a few last commercial items and will send the [BIMCO Charter] to you before the call." R. Doc. 16-5. The parties met on November 6 to review the latest drafts. That same day, Furic circulated a draft of the Price Sheet and the Scope of Work and noted that Hornbeck management's guidance and edits to the BIMCO Charter were in progress. R. Doc. 16-1 at 9; Shrives Decl. at ¶ 11. The Price Sheet memorialized that the parties had agreed to a day rate of $[redacted] for up to thirty-six GE personnel. R. Doc. 16-1 at 19. On November 10, Douglass circulated the BIMCO Charter for GE's review. *Id.* at 5. This version of

[4] Shrives's declaration is signed by electronic signature because Shrives is currently visiting Hornbeck's Brazil office. Shrives has authorized Hornbeck, through undersigned counsel, to use his electronic signature.

the BIMCO Charter listed the vessel as HOS BRIARWOOD; the delivery date as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours;" the term as ten months "firm;" and the port of delivery and redelivery as New Bedford, Massachusetts. R. Doc. 16-4 at 19–20. The parties met again on November 11 to work through the new draft, and on November 12, Furic sent additional edits to the BIMCO Charter. R. Doc. 16-1 at 1–4.

On November 13, Hornbeck and GE had a meeting during which they came to an agreement on many of the outstanding issues, including the vessel delivery date. Dennis Decl. at ¶ 5. On this call, GE informed Hornbeck that it intended to house fifty-two GE personnel aboard. Under the existing price schedule, this would have increased the vessel's day rate to $[redacted]. GE asked if Hornbeck could offer a discounted rate if GE locked in its number of GE personnel on board at fifty-two. Hornbeck took this request under consideration. *Id.*

Following the November 13 call, Furic wrote to the wider Hornbeck and GE teams: "We have agreed that @Douglass, Kevin include [Hornbeck] positions directly into the Bimco word format before next call , [sic] with the intention to close items. We understand that legal items will be remaining and will need a legal teams' discussion. <u>Yet, we should be able to close a majority of commercial points</u>." R. Doc. 16-2 at 2–3. Furic had previously communicated to Hornbeck that review by GE's legal team would be "the last step." Shrives Decl. Ex. D. The parties continued to work through the documents in the days that followed. During these discussions, GE requested that the charter duration be extended from ten months to twelve months. Hornbeck agreed. *Id.* at ¶ 12.

On November 16, Douglass circulated the BIMCO Charter with updated comments and volunteered Hornbeck to "create the file this week in BIMCO SmartCon if this helps to relieve the

burden on GE,"—often one of the final steps before a charter party is completely finalized. Shrives Decl. Ex. E. This version of the BIMCO Charter listed the vessel as HOS BRIARWOOD; the delivery date as "Upon delivery of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours;" the duration as twelve months firm; and the port of delivery and redelivery as New Bedford, Massachusetts. *Id.*

The parties met on November 17 to review the BIMCO Charter and discuss the remaining open terms. During this meeting, Hornbeck agreed, as an accommodation, to a discounted rate of $[redacted] to accommodate GE's increased number of passengers on board. Shrives Decl. at ¶ 13. Following the call, Furic circulated an updated BIMCO Charter incorporating the results of the parties' discussion. R. Doc. 16-8. In November 17 version of the BIMCO Charter, Furic confirmed that the parties had come to a final agreement on the date of delivery of the vessel on November 13. *Id.* Furic likewise circulated an updated Price Sheet, which confirmed the discounted day rate for HOS BRIARWOOD hosting fifty-two GE personnel. *Id.*

The parties met yet again on November 18 to resolve the remaining ancillary details. Shrives Decl. at 14. During this meeting, the parties came to an agreement on many of the outstanding details. *Id.* Evidencing the parties' progress, Furic stated: "<u>we have a contract</u>" and indicated that he would enter the final, agreed details into the BIMCO Charter and circulate the updated documents to Hornbeck for finalization following the call. *Id.*

Upon information and belief (but unknown to Hornbeck at the time), around the same time Hornbeck and GE reached a fixture, GE entered into discussions with a competitor of Hornbeck to address GE's vessel needs in respect of Vineyard Wind 1. Shrives Decl. at ¶ 15. Evidently, the competitor offered GE a better deal because, soon thereafter, GE's comportment changed dramatically. On November 19, having not yet received the updated BIMCO Charter as promised

by Furic, Douglass inquired to Furic as to the status of the BIMCO Charter. Furic stated that he had inadvertently saved over his changes to the BIMCO Charter but assured Douglass that he remembered the edits and would circulate the updated draft. Douglass Decl. at ¶ 19. On November 20, Hornbeck learned that Tyler Spofford of GE had traveled to Port Fourchon, Louisiana, a port and known hub for offshore supply vessels. Shrives Decl. at ¶ 16. Upon information and belief, Spofford visited Port Fourchon to tour the competitor's vessel for GE's evaluation. *Id.*

On November 21, Furic still had not recirculated the updated BIMCO Charter. For the first time, Furic claimed that he was awaiting management approval for the BIMCO Charter and that he expected to close out the charter party the following week. Douglass Decl. at ¶¶ 3–4. In an effort to distance GE from the agreement, in an email following the November 21 call, Furic wrote to Douglass: "as discussed, we haven't been able to take clear decision." R. Doc. 16-2 at 1. This was the very first time Furic or any GE representative had ever indicated any issues with respect to GE's decision-making process. On or around November 24, Adam Shrives, another member of the Hornbeck team, had a conversation with Boje, GE's broker, to inquire about the unanticipated delays on finalizing the BIMCO Charter. Boje assured Shrives that the parties had a deal. Shrives Decl. at ¶ 17.

As the time passed, GE's feet-dragging continued and Hornbeck pushed GE for a call to address the charter party. GE eventually agreed to a call on November 26, during which GE officially informed Hornbeck that it was repudiating the charter. Shrives Decl. at ¶ 18. In response, Hornbeck's president, Todd Hornbeck, directly asked Boje whether there had been an agreement between Hornbeck and GE. *Id.* On the call, with all parties present, Boje confirmed that a charter had been fixed. *Id.* GE personnel offered no response to Boje's statement, except to claim that the parties had not yet agreed on all modifications for HOS BRIARWOOD—an issue far outside the

charter party's essential terms. *Id.* Upon information and belief, at the conclusion of the November 26 call, Boje remained on the line with Furic and the GE team, at which time Boje reiterated to the GE team that GE and Hornbeck had reached a binding fixture on the charter.[5]

After GE's breach, Hornbeck sought to resolve the dispute consistent with the alternative dispute resolution provision in the BIMCO Charter. After inviting senior-level discussions, Hornbeck initiated mediation with the International Chamber of Commerce ("ICC"), and, in accordance with the final stage of the agreed upon charter party provision, filed a request for arbitration with the ICC's International Court of Arbitration ("ICA"). R. Docs. 16-10, 16-11, 16-14, and 16-21. On April 30, 2026, GE sent a letter to the ICC disputing the existence of a contract and demanding that the ICC hold the arbitration proceedings in abeyance. R. Doc. 16-21. The ICC declined on May 12, 2026. Next, GE filed a Petition for Stay of Arbitration, Injunctive Relief, and Declaratory Judgment and this Motion for Order to Show Cause for Preliminary Injunction and Temporary Restraining Order. R. Docs. 16-25 and 1.

## III. LEGAL STANDARD

"The standard for an entry of a TRO is essentially the same for a preliminary injunction." *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). To obtain injunctive relief, a moving party must demonstrate (1) a likelihood of success on the merits of their claim; (2) irreparable harm absent an injunction; (3) that the balance of the equities tip in the moving party's favor; and (4) that an injunction is in the public interest. *New York v. Trump*, 765 F. Supp. 3d 287, 291 (S.D.N.Y. 2025) (citing *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020)). Of these four showings, "[a] showing of irreparable harm is the single most

---

[5] Boje relayed this event and restated his position that the parties had reached a fixture yet again to a member of Hornbeck's team in the weeks following GE's breach.

important prerequisite to the grant of injunctive relief." *Id.* (quoting *Faiveley Transp. Malmo AB v. Mabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)) (citation modified).

The Second Circuit has cautioned that injunctive relief "is an extraordinary remedy never awarded as of right." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (citation omitted). As the moving party GE must "demonstrate, by a clear showing, that the necessary elements are satisfied." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 392 (S.D.N.Y. 2011) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (citation modified).

## IV. ANALYSIS

### A. GE is not likely to succeed on the likelihood of the merits because the parties reached a binding fixture under maritime law.

To be entitled to a preliminary injunction, GE must make a "clear showing" that it is substantially likely to succeed in showing that the parties did not reach a binding charter party. But, under binding maritime law, a charter party is formed when the parties have a meeting of the minds on the essential terms of the charter. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001). A court must therefore examine the parties' written communications to determine "whether they have formed an agreement to arbitrate." *Id.*

"As a maritime contract[,] a charter party is governed by maritime law and thus need not be in writing unless expressly so required by an applicable statute." *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 124 (2d Cir.1982) (citation omitted).

> [C]harter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship, and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture."

*U.S. Titan*, 241 F.3d at 149 (citation omitted).

A fixture of main terms is a "binding agreement . . . , which is a commitment that a voyage will be performed, and one which presupposes a final contract, with main terms set, and final details to be resolved subsequently." *Id.* (citation omitted). "Second, after a 'fixture' has been reached, the parties continue to negotiate 'details' amending the form contract specified in the 'fixture.' These minor or side issues 'flesh-out' the original agreement or fixture." *Id.* at 149–50 (citation omitted).

Under maritime law for charter parties, a failure to agree to the final iteration of the charter party, "including all minor terms—for example, if a board of directors or executives failed to ratify the charter party—'would not prevent or undo formation of the charter party. Instead, the failure would constitute a breach of the charter party.'" *Sunskar Ltd. v. CDII Trading, Inc.*, 828 F. Supp. 2d 604, 616 (S.D.N.Y. 2011) (citation modified). These authorities control the outcome here.

**1. GE and Hornbeck reached a fixture by agreeing to the final essential term on November 13, 2025.**

Despite GE's painstaking efforts to characterize every possible term in the transaction as "essential," the law in the Second Circuit is clear: essential terms include "the name of the charterer, name of owner, ship and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important." *Great Circle Lines,* 681 F.2d at 125. Hornbeck and GE reached an agreement as to each of the identified terms. And neither Hornbeck nor GE identified any "other term" that stood as sufficiently "important" to prevent a fixture.

<u>Name of the charterer and name of owner</u>.

The vessel owner and the charterer were agreed and obvious from the outset. Every version of the BIMCO Charter circulated throughout the negotiation listed the owner as Hornbeck Offshore Operators, LLC and the charterer as GE Renewables US LLC. Shrives Decl. at ¶ 20.

Vessel name and characteristics.

Initially, GE and Hornbeck discussed an array of potential vessels that each had the characteristics necessary to perform GE's intended scope of work. On October 7, the parties agreed that HOS BRIARWOOD was the ideal vessel for GE's Vineyard Wind 1 project. Dennis Decl. Ex. A. From that moment forward, every negotiation effort contemplated the use of HOS BRIARWOOD for the Vineyard Wind 1 Project.

Hire rate.

The parties agreed to the hire rate for HOS BRIARWOOD on October 7. In the October 7 proposal Hornbeck sent GE through Clarksons, Hornbeck proposed HOS BRIARWOOD at a certain rate, which allowed for up to thirty-six GE personnel. Dennis Decl. Ex. A.

On November 13, GE informed Hornbeck that it intended to house fifty-two GE personnel aboard. Under the agreed terms, fifty-two GE personnel would have increased the day rate. At that time, GE asked Hornbeck for a discounted rate if GE locked in the number of hosted GE personnel at fifty-two. On November 16, as an accommodation to GE, Hornbeck agreed to discount the rate to $[redacted]. The parties confirmed this day rate during a meeting on November 17.[6] Shrives Decl. at ¶ 13. This discounted rate is reflected in the Price Sheet circulated by Furic on November 17. Shrives Decl. Ex. F.

Charter duration.

The parties agreed to the charter duration on or around November 12. Although Hornbeck and GE had been negotiating a ten-month charter, in the days leading up to fixture, Spofford of

[6] This change in day rate does not, as GE suggests, evidence a lack of fixture. HOS BRIARWOOD's price was always subject to change based on the number of passengers on board. If anything, the change reflects a subsequent detail insofar as GE agreed to fix the number of GE personnel rather than have the ability to vary the number over time.

GE requested that the charter duration be extended from ten months to twelve months. Shrives Decl. at ¶ 12. Hornbeck accepted this request, and this change is reflected in the last two versions of the BIMCO Charter. Shrives Decl. Ex. E; R. Doc. 16-8.

<u>Port of delivery and redelivery</u>.

The parties agreed to the port of delivery and redelivery from the inception of their communications. Hornbeck's initial proposal sent on June 25, listed the place of delivery and redelivery as New Bedford, Massachusetts, as did the initial draft of the BIMCO Charter circulated by the Hornbeck. Dennis Decl. Ex. A. This remained true of every subsequent version of the BIMCO Charter circulated by either party. No redlines or comments ever appeared on this term, and neither party ever expressed disagreement over these terms. *See, e.g.,* R. Doc. 16-2; Shrives Decl. at ¶ 21.

<u>Time of delivery</u>.

The parties agreed to the time of delivery on November 13. Dennis Decl. at ¶ 5. The final circulated draft of the BIMCO Charter lists the date of delivery as "Upon availability of the Vessel following redelivery from Owners' other customer, but no sooner than December 15, 2025 at 0001 hours." Kevin Douglass (Hornbeck) commented on the term: "Agreed and closed in Nov 13 meeting." Pierre Furic (GE) responded: "Comment was made that Lds [liquidated damages] and cancelling date shall be based on clear delivery date." R. Doc. 16-8. GE contorts Furic's comment into an objection to Douglass's comment and a "demand for a clearer delivery date." R. Doc. 15 at 23. But Furic's comment merely makes clear that <u>other</u> terms (i.e., liquidated damages and right to cancel) might be needed in the event of a failure to perform.

<u>Any other term that a party deems important</u>.

Throughout its brief, GE identifies a number of other terms—including early termination, interest, taxes, liquidated damages for late delivery, mobilization, cancelation, pre-delivery,

provisions relating to offshore transportation, invoicing, offhire, performance standards, owner's damage liability, force majeure—that GE now unilaterally asserts are "essential." R. Doc. 15 at 24–25. But GE cannot cite any legal authority for the proposition that these terms are essential. Nor does GE even attempt to provide evidence that the parties themselves considered these terms essential while negotiating the contract. *See Sunskar*, 828 F. Supp. 2d at 617 (suggesting that a party arguing a term was essential bears the burden of establishing that it is essential).

GE's post hoc characterization of these details as essential ignores fundamental principles of maritime law and runs counter to established, binding circuit authority. The record confirms what the law requires: Hornbeck and GE agreed to the (recognized) essential terms, as listed and described above. And, to the extent GE argues that the parties deemed any other terms to be "essential" in respect of making a fixture, it has failed to make any factual showing to that effect.[7]

**2. Communications by GE and GE representatives confirm the parties reached a binding fixture.**

Aside from their agreement as to the actual terms of the charter party, communications show that, even beyond a fixture, the parties were nearing finalization on the finer details of the charter party. On November 13, Furic emailed the wider Hornbeck and GE teams stating, "We have agreed that @Douglass, Kevin include HOS positions directly into the Bimco word format before next call, with the intention to close. We understand that legal items will be remaining and will need a legal teams' discussion. Yet, we should be able to close a majority of commercial points." R. Doc. 16-2 at 2–3. Furic had previously instructed that review by GE's legal team "will be the last step, once all the rest has been clarified." R. Doc. 16-2 at 2–3.

[7] Nor does the draft Early Works Agreement, which was never executed, prevent a finding of fixture. This single document contained form language that was never edited by the parties and was circulated for the first time **after** the parties entered into a fixture.

GE's representative also expressly acknowledged that the parties had reached a fixture. Furic stated on a November 18, 2025 conference call that "we have a contract." Shrives Decl. at ¶ 14. Boje, GE's broker, confirmed this sentiment both to Hornbeck and to GE. On or around November 24, Shrives (a Hornbeck representative) had a conversation with Boje, to inquire about the unanticipated delays on finalizing the BIMCO Charter. Boje reassured Shrives that the parties had a deal. Shrives Decl. at ¶ 17. Then, on the November 26 call during which GE repudiated the agreement, Boje again confirmed that a charter party had been fixed. Shrives Decl. at ¶ 18. Upon information and belief, Boje remained on the line with Furic and other GE personnel, at which point Boje reiterated that the parties had reached a binding deal on the charter. And Boje expressed this position yet again to Michael Nicaud of Hornbeck in the weeks following GE's breach.

**3. Fixture is not contingent on either a written fixture recap or a signed charter party.**

GE argues that a fixture recap "is the basis in virtually all cases finding agreement to a fixture" and, because the parties did not have a formal fixture recap in this case, GE contends that no fixture was reached. R. Doc. 15 at 21. Notably, GE fails to cite any authority conditioning fixture on a formal fixture recap. None. GE's lack of authority to support its assertion flows from the fact that the law does not require a fixture recap to find a fixture. Moreover, GE's characterization that "virtually all cases" finding a fixture do so on the basis of a written fixture recap is wish-casting. Fixture is indeed found even without a formal fixture recap. *See, e.g., Sunskar Ltd. v. CDII Trading Inc.*, 828 F. Supp. 2d 604, 607 (S.D.N.Y. 2011) (finding fixture despite no fixture recap).

GE further argues that the parties did not reach a fixture because they did not sign a final-form charter party. *See, e.g.,* R. Doc. 15 at 12 ("The Parties at no time executed any version of the Negotiating Draft."); *id.* at 20 ("Hornbeck's own pleading concedes that the Parties had no signed

agreement.”). But GE’s argument “ignor[es] law in this Circuit that a court must examine the parties’ written communications to determine whether they have formed an agreement to arbitrate, and that a charter party need not be in writing.” *Sunskar*, 828 F. Supp. 2d at 617–18 (citation modified); *see also Great Circle Lines*, 681 F.2d at 124 (“As a maritime contract a charter party is governed by maritime law and thus need not be in writing unless expressly so required by an applicable statute.”) (citation modified). The fact that the parties never signed a final form charter party and referenced signing the charter party as a future event is of no moment because federal maritime law is clear that the parties were bound upon fixture, not the signing of a finalized charter party. GE’s citation to statements by Hornbeck and GE personnel about “finalizing the contract” are simply not the smoking gun GE asserts. *See, e.g.,* R. Doc. 15 at 11 (GE’s Furic stating “I suggest we finalise contract once we have management confirmation to proceed with your offer.”); *id.* (citing the Early Works Agreement as stating that it would terminate “upon execution of the Time Charter”) (citation modified). They are references to the many details that typically follow a fixture. But none of them prevent a fixture. And a fixture is the essential issue in maritime law.

**B. GE will not suffer irreparable harm by participating in arbitration proceedings.**

The second—but most important—element GE must establish to be entitled to injunctive relief is that it will suffer irreparable harm absent injunctive relief. To meet this burden, GE argues that it will lose time and resources arbitrating a dispute that it claims is not arbitrable. But, again, GE lacks authority for its argument.

Black letter law confirms that “[i]rreparable harm ‘means injury for which a monetary award cannot be adequate compensation.’” *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)) (citation modified); *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 985 (2d Cir. 1997)

("[A]n injury that is adequately compensated by a monetary award is not considered 'irreparable.'") (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996)).

Fighting uphill against this well-established authority, GE cites *Maryland Casualty Company v. Realty Advisory Board on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997). By GE's reading, that case held "that the plaintiff would suffer irreparable harm if forced to expend time and resources arbitrating an issue that was not arbitrable and for which any award would be unenforceable." R. Doc. 15 at 27. But that was not the holding of *Maryland.*

In *Maryland*, the Second Circuit explained that injuries which <u>can</u> be compensated by a monetary award are <u>not</u> irreparable and, on that basis, found irreparable harm because neither the parties' agreement nor the rules under which they were arbitrating provided for a monetary award of attorneys' fees or damages. *Id.* The fact that Maryland could never recover the time and resources it would expend in arbitration led to the irreparable harm conclusion. *See id.* Properly expressed, *Maryland* stands for the limited proposition that a party's participation in an arbitration proceeding that it considers to be unenforceable can <u>only</u> constitute irreparable harm when there is <u>no mechanism for the prevailing party to recover attorneys' fees or costs</u>.

The Second Circuit made this holding abundantly clear in *Resource Group International Ltd. v. Chishti*. 91 F.4th 107 (2d Cir. 2024). In *Resource Group International*, the Second Circuit considered whether the district court had properly rejected the plaintiff's claim that, absent an injunction, it would be irreparably harmed through participating in arbitration proceedings it considered to be unenforceable. *Id.* at 110–11. The *Resource Group International* court confirmed that the Second Circuit's "holding in *Maryland* created an avenue for parties to establish irreparable harm related to forced arbitration of inarbitrable claims, but it was largely limited by our acknowledgement that an inquiry that is <u>adequately compensated by a monetary award</u> is not

considered irreparable." *Id.* at 115 (citation modified). Having acknowledged this, the Second Circuit instructed that "the critical issue for the Court to consider is whether the proffered injury is compensable, specifically . . . whether attorneys' fees and arbitration costs are available to the prevailing party." *Id.* at 116. GE ignores this concept. And it destroys GE's argument.

In this case, the parties are arbitrating under the ICC Rules. It is well-established that the ICC Rules give the arbitral tribunal broad authority to award costs and fees. The ICC Rules provide that "[t]he final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties." ICC Rules Art. 38(4). The "costs of arbitration" "shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, . . . as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration." *Id.* at Art. 38(1) (emphasis added).

Courts routinely recognize that these provisions of the ICC Rules make available an award of attorneys' fees and costs. In *The Shaw Group, Inc. v. Triplefine International Corp.*, the Southern District of New York confirmed an arbitration award that included attorney's fees, agreeing with the arbitrator that the ICC Rules classify attorneys' fees as a cost of arbitration and that the Rules require that the arbitration award "shall fix such costs and decide how to allocate them between the parties."[8] No. 01-CV-4273, 2003 WL 22077332, at *2–3 (S.D.N.Y. Sept. 8, 2003); *see also Ministry of Def. & Support for the Armed Forces of* the *Islamic Rep. of Iran v. Cubif Def. Sys. Inc.*, 665 F.3d 1091, 1104 n.9 (9th Cir. 2011) (recognizing that the ICC had discretion to award attorney's fees to the prevailing party in arbitration proceedings); *Amadeus IT*

[8] When the *Shaw Group* court considered the issue, the rule was Rule 31. While materially unaltered, the rule has been renumbered as Rule 38.

*Grp., S.A. v. Ebix, Inc.*, No. 22-CV-4109, 2023 WL 10476021, at *6 (N.D. Ga. June 22, 2023) (confirming an ICC arbitration award allocating attorneys' fees to the prevailing party because there is not "any ambiguity in Article 38 of the ICC Rules: the arbitral tribunal was empowered to allocate the 'costs of arbitration,' including the parties' legal costs, among the parties as part of its final award"); *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. 90-CV-0169, 1992 WL 122712, at *6 (D.D.C. May 29, 1992) ("[U]nlike arbitrator's fees and ICC administrative costs, which are fixed by the ICC Court, the quantum of legal costs is fixed by the arbitrator himself."); *Saipem Am., Inc. v. Wellington Underwriting Agencies, Ltd.*, No. No. 07-CV-03080, 2008 WL 2276210, at *1 (S.D. Tex. Mar. 18, 2008); *ESCO Corp. v. Bradken Res. Pty Ltd.*, No. 10-CV-788, 2011 WL 1625815, at *12 (D. Or. Jan. 31, 2011) ("Here, Bradken does not dispute that Article 31 provides the arbitrator the authority to award attorneys['] fees and costs.").

As no fewer than half a dozen courts have recognized, arbitrators have wide discretion under the ICC Rules to award attorneys' fees and costs to the prevailing party. Under *Resource Group International*, GE's participation in arbitration proceedings <u>cannot</u> constitute irreparable harm, because, <u>in the event that GE prevails in arbitration, GE may be adequately compensated</u>. The ICC's allowance for attorneys' fees and costs dooms any argument GE could make that participating in arbitration will harm—let alone irreparably harm—it.

GE's irreparable harm claim fails for another fundamental reason: its participation in the ICC proceedings is not "imminent" as GE asserts. GE asks this Court to enjoin the arbitration before its answer comes due on May 26, asserting that it "has exhausted potentially available ICA institutional remedies before turning to this Court." R. Doc. 15 at 28. But GE's assertion of exhaustion is demonstrably false.

Hornbeck agrees that GE's answer is due May 26. But the ICC Rules (and the ICC correspondence setting the answer date) expressly permit respondents to request an extension of that deadline—a remedy GE has conspicuously failed to pursue. R. Doc. 16-20 at 2. GE did seek an abeyance, which the ICC denied. That denial does not, as GE implies, exhaust all available institutional remedies. A request for an extension is an entirely separate avenue, and nothing prevents GE from seeking one. Moreover, what is at stake on May 26 is the filing of an initial pleading. GE is not faced with an imminent final determination of its liability. Having bypassed the straightforward option of requesting an extension of time to answer, GE cannot now claim with any credibility that it had no choice but to run to this Court.[9] To be clear, Hornbeck would oppose an extension sought simply for delay's sake. But given the extraordinary relief GE seeks, the record must be clear as to what harm GE will actually suffer (or not) if this Court denies injunctive relief.

**C. The balance of the equities does not favor GE.**

The third factor requires GE to make a clear showing that the balance of the equities tips in its favor—meaning the hardships to GE from denying the injunction must outweigh the benefits to Hornbeck from granting it. *Nat'l Fuel Gas Distrib. Corp. v. Christian*, 798 F. Supp. 3d 267, 277 (N.D.N.Y. 2025); *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, No. 99-CV-9214, 1999 WL 34981557, at *5 (S.D.N.Y. Sept. 13, 1999). GE cannot make that showing.

Even if GE did not have option to seek an extension (which it plainly does), GE faces no meaningful burden from participating in arbitration while this Court considers the merits of GE's

[9] GE's claim of irreparable harm fails for an even simpler reason. After GE filed its petition on May 14, 2026, Hornbeck offered to GE that both parties waive arbitration and proceed on the merits of the dispute in this Court. But GE declined. When presented with the opportunity to terminate the arbitration proceedings, GE said no. It cannot say, one week later, that its participation in the arbitration proceedings that it refuses to waive will irreparably harm it. While arbitration is technically the proper venue, Hornbeck simply wants to proceed. And GE wants to avoid accountability. That is the reality of this dispute.

claims on a non-expedited basis. Allowing the proceedings to move along in tandem will not create significant duplicative work or expense because the issues in the arbitration are identical to the issues in this case. Indeed, with the projected duration of arbitration proceedings reaching "an average duration of 20 months, with a median duration of 16 months" this Court may reach a decision on the merits of this case before the ICA issues a final award.[10]

Even if the ICC were to issue a final decision before the merits of this case are decided, GE will not suffer. GE does not contend that the ICC will fail to afford it a fair hearing. *See Leibowitz v. Smith Barney Inc.*, 863 F. Supp. 171, 175 (S.D.N.Y. 1994) (finding that the balance of the equities did not favor the plaintiffs, who were seeking to enjoin arbitration, because, among other things, "plaintiffs have not suggested that [they] will not receive a fair hearing from the NASD"). To the contrary, arbitration may actually benefit GE: if GE is correct that no arbitration agreement exists, the tribunal could award GE costs and attorneys' fees. And, if GE believes an arbitral award is erroneous, it retains the right to seek judicial review under the FAA. *See* 9 U.S.C. § 10; *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co.*, 698 F. Supp. 504, 519 (S.D.N.Y. 1988) (finding that plaintiffs suffer no harm by continuing to participate in arbitration proceedings pending litigation because even "[i]f the arbitration were in fact biased, plaintiffs could challenge that award and, if successful, it will have no effect. If there were no bias, the award will properly receive the effect to which it is entitled by law"). In no way has GE demonstrated actual harm.

[10] *See* Helen Conybeare Williams, *To Make a Long Story Short: Saving Time and Costs in Fast Track ICC Arbitration*, HAYNES BOONE, https://www.haynesboone.com/getcontentasset/330c31ac-7428-4fa8-b751-c273d4fa67dd/141d77fc-2e06-49eb-b14c-2ff58f5ce730/expedited_arbitration.pdf?language=en-US ("[I]n November 2015, the LCIA [London Court of International Arbitration] published an analysis of the duration of LCIA arbitration proceedings from receipt of the Request for Arbitration to the final award (including stays) reporting an average duration of 20 months, with a median duration of 16 months, with three member tribunals typically taking longer. There are no comparable statistics published by the ICC.")

Hornbeck, by contrast, would suffer concrete harm if an injunction were wrongly issued. An injunction would strip Hornbeck of its contractual right to arbitrate—the very forum that Hornbeck and GE agreed upon in the BIMCO Charter. Courts have recognized that the loss of an agreed-upon arbitral forum constitutes irreparable harm. *See UBS Sec. LLC v. Prowse*, No. 20-CV-217, 2020 WL 433859, at *7 (S.D.N.Y. Jan. 27, 2020) ("[L]osing the ability to enforce an arbitration agreement is a form of irreparable harm."). The balance of the equities does not weigh in favor of injunctive relief. Indeed, the opposite is true.

**D. An injunction does not serve, and indeed would disserve, the public interest.**

The final injunctive relief factor requires that GE show that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that an injunction is in the public interest."); *N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (same). This factor "should be given considerable weight in determining whether a motion for a preliminary injunction should be granted." *Gov. Employees Ins. Co. v. Strut*, 758 F. Supp. 3d 140, 148 (W.D.N.Y. 2024) (citation modified). On this factor, GE fails again.

Courts have consistently held that enjoining arbitration proceedings does not vindicate the public interest—it harms it. In *Streamlined Consultants, Inc. v. Forward Financing, LLC*, the court flatly rejected the same theory that GE advances here: "the balance of hardships and the public interest favor denying Plaintiffs' requested injunction because it is well-established that the FAA's provisions manifest a strong public policy in favor of arbitration." No. 21-CV-10838, 2022 WL 766233, at *3 (S.D.N.Y. Mar. 14, 2022) (collecting cases). Worse still, granting such relief would "open the floodgates to frivolous lawsuits seeking to forestall arbitration proceedings, all of which will further diminish its already scarce judicial resources." *Id.*

Granting GE's motion would cause precisely that harm. Enjoining the ICC proceedings would not only delay a dispute resolution process that Congress specifically designated to serve the public interest, but it would also signal to every party facing arbitration that filing for injunctive relief is a viable stalling tactic. The result would be a flood of meritless litigation that would create a burden on the judiciary. An injunction here would harm the public interest, not serve it. GE has failed to meet its burden on the final injunctive relief element. Its motion should be denied.

## V. CONCLUSION

GE entered into a binding charter party for HOS BRIARWOOD. When it got a better offer, GE sought to escape its obligations under the charter party. When Hornbeck tried to exercise its rights that the parties had specifically agreed would govern disputes exactly such as this, GE first refused to participate in ADR steps and, later, took the drastic step of seeking an injunction.

GE's attempt to make an injunction cure its buyer's remorse fails at every turn. GE cannot show likelihood of success on the merits because the parties reached a fixture on every essential term. It cannot show irreparable harm because GE faces no imminent or irreparable harm. Even if GE's answer deadline were imminent and this matter is ultimately deemed non-arbitrable, the ICC Rules allow full recovery of fees and costs. Finally, the equities and the public interest weigh against injunctive relief because Hornbeck stands to lose its agreed-upon arbitral forum, and granting relief would invite every reluctant arbitration party to run to federal court first.

GE has failed to satisfy a single element of the extraordinary burden required for injunctive relief. The Court should deny GE's Motion in its entirety.

Dated: May 21, 2026

Respectfully submitted,

*/s/ Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel.: (469) 904-4550
Fax: (469) 444-5002
dcharest@burnscharest.com

Matthew Tripolitsiotis (MT9413)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, New York 10017
Tel.: (469) 895-5269
Fax: (469) 444-5002
mtripolitsiotis@burnscharest.com

Claire B. Curwick (*pro hac vice applicant*)
Lauren M. Perry (admitted *pro hac vice*)
BURNS CHAREST LLP
201 St. Charles Avenue, Suite 2900
New Orleans, Louisiana 70170
Tel.: (504) 799-2845
Fax: (504) 881-1765
ccurwick@burnscharest.com
lperry@burnscharest.com

Counsel for Hornbeck Offshore Operators, LLC

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT-LIMITATIONS

I, Daniel H. Charest, pursuant to Local Rule 7.1(c), hereby certify that this document contains 7,814 words. This word count does not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes or endnotes. I relied on the word count of the word-processing program used to prepare the document.

Dated: May 21, 2026

*/s/ Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)